EDWARDS *v.* SWILLEY.

4-5095

Opinion delivered June 27, 1938.

*C. B. Crumpler* and *C. A. Barnett,* for appellants.

*Tom Marlin* and *W. A. Speer,* for appellees.

GRIFFIN SMITH, C. J.   Suits by Julia Clay Crawford and Annie Clay Edwards for cancellation of certain quitclaim deeds they had executed, and for other equitable relief, were consolidated for trial.   From an adverse decree they have appealed.

W. R. Clay owned an ancestral estate of 120 acres in Union county upon which he and his wife resided prior to their deaths May 20, 1919.   There were no children.

It is alleged that each of the plaintiffs, by virtue of inheritance from their brother, W. R. Clay, is the owner of an undivided one-fifth interest in the land, subject to the life estate of Dr. J. A. Clay, father of W. R. Clay; that W. R. Clay died intestate leaving five brothers and sisters; that execution of the quitclaim deeds was induced

through fraud practiced upon the plaintiffs by W. L. Swilley, R. W. Rhodes, and Hugh Rhodes, and that such fraud was accompanied by threats and intimidation.

Early on May 21, 1919, the bodies of W. R. Clay and his wife, Jessie Britt Clay, were found in the ruins of their fire-destroyed home. Frank Livingston, negro, lived nearby. Appellees offered witnesses who heard Livingston confess to having murdered the couple. Livingston's statement was that he killed the husband about dark; that he went to the house complaining to Mrs. Clay of a headache; that when Mrs. Clay opened a bureau drawer to get aspirin tablets he grabbed her, and about eleven o'clock that night when she undertook to get away he hit and killed her with a shotgun barrel. He then dragged and carried Mr. Clay's body into the house and set the building on fire.

Mrs. Clay was survived by her father, R. M. Britt; also by her mother, four brothers and sisters, and three children of deceased sisters.

There is testimony that members of the two families met and divided the personal property, agreeing that Dr. J. A. Clay and R. M. Britt should have the farm. Testimony on behalf of appellants is that there was no such family meeting of which they had knowledge.

August 31, 1919, Dr. J. A. Clay and R. M. Britt and their wives, by warranty deed, conveyed the land to Hugh Rhodes for $1,200—a fair price at that time for the fee. This deed was recorded December 20 of the same year. The money was divided equally between the grantors.

Appellees. undertook to show that W. R. Clay had executed a will in favor of his wife; that the husband died first, and that under such will title to the land passed to Mrs. Clay. Testimony of witnesses who claimed to have heard Livingston confess to the murders and to having narrated the sequence of execution was objected to. Such testimony, being the best evidence, was competent: 1 R. C. L., page 500, §§ 41-42. *St. Louis, I. M. & S. Ry. Co.* v. *Gibson,* 113 Ark. 417, 168 S. W. 1129.

But existence of the will at the time of the testator's death was not satisfactorily established. Witnesses who

claimed to have seen it and to have partially read it, and to have discussed it with the testator, were not sufficiently clear, nor did the time of such discussions and inspections preclude subsequent alterations or revocation.

While the evidence does not show that there was a family meeting of all interested parties at which a division of the estate was agreed upon, it is apparent that appellants knew Dr. J. A. Clay and R. M. Britt had assumed control of the property, and that they and their wives had joined in the warranty deed to Rhodes.

R. W. Rhodes, son of the grantee, undertook on several occasions to clear the title. Mrs. Crawford testified that she had known R. W. Rhodes intimately for seventeen years: "Several years back, it seems to me, he attempted two or three times to get me to sign the quitclaim deed." On cross-examination she said: "I thought Mr. Rhodes bought the land from Mr. Britt."

Dr. J. A. Clay, Sr., after stating that . . . "there wasn't anybody in the agreement [to sell the property] but Britt and me," told of dividing the proceeds. He said: "My children made a claim to the property all the time, when they [Rhodes and others] came to them to get them to sign these deeds. . . . I had promised Mr. Rhodes a full and complete title to the land and only tried to do what I had promised."

Dr. S. R. Clay, one of the brothers, testified: "My father did not consult me about the sale to Mr. Rhodes. About 1923 or 1924 Mr. Rhodes came to me to get me to sign a deed. He claimed he didn't have a title until all the heirs had signed. . . . I knew by hearsay the place had been disposed of."

H. O. Clay testified: "I knew my father and mother and Mr. Britt and his wife sold the land to Mr. Rhodes. I understood that my father got $600, or half of the $1,200. I think the family all knew about it."

Dr. J. A. Clay, Jr., testified: "I didn't know my father and mother and my brother had sold that land to Mr. Rhodes in 1919. I heard it some few years later—about four or five years later."

Other testimony points strongly to knowledge on the part of all concerned that the property had been sold to Rhodes, and we do not think appellants were without information as to facts so well known to other members of the family. If it be conceded that the family meeting which appellees claim was participated in by the parties in interest was not held at the time nor in the manner alleged, still it seems conclusive that they had knowledge of what disposition Dr. Clay and Mr. Britt and their wives had undertaken to make of the lands, and acquiescence throughout the years, will defeat their claims at this late date. Family settlements are favored. *Dudgeon* v. *Dudgeon*, 119 Ark. 128, 177 S. W. 402.

Rhodes' act in recording the deed in 1919 would not, alone, have the effect of starting the statute of limitation. Actual knowledge of the estate granted was necessary. It was only when contiguous oil activities indicated that the lands might be of considerable value that appellants became active and executed oil leases.

The court is also of the opinion that the testimony does not sufficiently show fraud, coercion, undue influence and intimidation in procurement of the quitclaim deeds.

The decree is affirmed.