### JONES *v.* MORGAN.

4-5157

121 S. W. 2d 96.

Opinion delivered November 14, 1938.

*Gaughan, Sifford, Godwin & Gaughan,* for appellant.
*Mahony & Yocum* and *W. A. Speer,* for appellee Morgan; *Jeff Davis, J. A. O'Connor, Jr.,* and *B. L. Allen,* for appellee Lion Oil Refining Company.

GRIFFIN SMITH, C. J. A. T. Morgan, Jr., died in 1932. Mrs. Edna Morgan, plaintiff below and one of the appellees herein, is the widow of A. T. Morgan. By deed she acquired the interests of her own children and her husband's children as heirs to the real property which forms the subject-matter of this suit, but Mrs. Morgan's own title and that of her husband are questioned.

A. T. Morgan, Jr., was one of five children born to A. T. Morgan, Sr., and Sophronia Morgan, husband and wife. Hereafter in this opinion the junior Morgan will be referred to as A. T. Morgan. Other than appellant Georgia Morgan Jones and A. T. Morgan, the children were: W. H. Morgan, who died survived by his widow and two children; J. H. Morgan, who died survived by his widow, Mollie Nesbit Morgan, and by a son, Harold; and John Lee Morgan.

Appellants contend that as heirs of A. T. Morgan, Sr., and Sophronia Morgan, they are entitled to their respective shares of 133 acres of land whereon oil has been found in paying quantities. Appellee Lion Oil Refining Company, by *mesne* assignments, holds an oil and gas lease.

The record indicates that A. T. Morgan, Sr., lost title to the land in question, but that it was acquired by Sophronia Morgan, who was owner at the time of her death in 1899. Her husband died in 1897.

Appellants contend that Mrs. Sophronia Morgan died intestate. Appellees insist that she made a will in favor of John Lee Morgan. It was not probated, and presumably was lost, if in fact it was ever made.

It is shown by appellees that A. T. Morgan lived on the property for a number of years. Improvements costing $1,300, and certain repairs, were made, the work having been done about the year 1910. From 1921 until his death, A. T. Morgan had tenants on the property. He paid taxes, retained the crops, sold timber, and in other respects treated the property as his individual estate.

In an affidavit dated January 18, 1937, Mrs. Georgia Morgan Jones stated that her brother, J. L. Morgan, ac-

quired title to the land either by will or deed. Later, according to this affidavit, J. L. Morgan conveyed to A. T. Morgan. Mrs. Jones stated: "It was generally under-stood among the members of our family and all of my brothers that A. T. Morgan owned this land and claimed it as his own. A. T. Morgan lived upon the west half of the southeast quarter of section eighteen for many years as his home, after he obtained a deed to the land from J. L. Morgan. . . . I never heard of my brothers, W. H. Morgan or J. H. Morgan, claiming any interest in this land after it was acquired as before stated by A. T. Morgan from J. L. Morgan."

June 11, 1936, J. L. Morgan signed an affidavit, stating that January 31, 1900, he deeded the west half of the northeast quarter and the east two-thirds of the west half of the northeast quarter of section eighteen, etc., to A. T. Morgan. The affidavit recites that J. L. Morgan acquired title by will from his mother about the year 1899; that such will had never been "recorded," and is now either lost or destroyed.

March 10, 1936, appellee Edna Morgan executed an oil and gas lease in favor of Edwin M. Jones, and Lion Oil Refining Company acquired that part of the lease affecting the property herein involved.

May 5, 1937, Georgia Morgan Jones, J. B. Jones, Mollie Nesbit Morgan, John L. Morgan, Maude Morgan, and Harold Morgan, appellants herein, contracted with Wm. P. Ford, an oil man of Kilgore, Texas. Ford agreed, in consideration of a one-half interest, to "prosecute any and all actions necessary to recover the interests of [appellants] in the land." May 8, 1937, Ethel B. Morgan, wife of Harold Morgan, entered into a similar agreement with Ford.

May 14, 1937, Mrs. Edna Morgan filed suit in chancery against all of the parties, by which it was sought to cancel the contracts as clouds upon her title. She sought, also, to confirm title in herself. The defendants answered. They also cross-complained against Lion Oil Refining Company. By the cross-complaint it was sought to cancel the lease executed by Mrs. Edna Morgan to

Edwin M. Jones and the assignment to Lion Oil Refining Company as to mineral rights on that part of the land involved in this suit. The Oil Company answered, pleading the statute of limitations, laches, and alleging that John Lee Morgan and Mrs. Georgia Morgan Jones were estopped on account of representations made in the affidavits heretofore set out.

The chancellor dismissed the cross-complaint for want of equity and directed that the contracts entered into with Ford be cancelled. It was decreed that titles of the parties plaintiff and cross-defendants be quieted and confirmed.

The record is large, and includes the testimony of many witnesses. Appellants concede that the principal questions are, Was A. T. Morgan claiming the land adversely to the other heirs? If, in fact, his claim was adverse, was such claim brought to the attention of the heirs? If so, when?

The fundamental principle of law which appellants insist is controlling is conceded by appellees: one tenant in common cannot claim adverse possession against a co-tenant by the mere act of occupancy.

Mrs. Josephine Morgan, wife of W. M. Morgan, testified that her husband had never claimed any interest in the land, nor did any of the other heirs after A. T. Morgan acquired it; that she had heard Mrs. Georgia Morgan Jones and J. H. Morgan and J. L. Morgan refer to the property as "Buddy's farm." Marvin Morgan, son of A. T. Morgan, was present when John Lee Morgan executed the affidavit. He says it was written by a man named Borden, who handed it to the affiant; that affiant said he had lost the will, but perhaps for $5 he could "dig it up."

The notary public who acknowledged Mrs. Jones' affidavit testified that Mrs. Jones looked at it long enough to read it. After signing the affidavit Mrs. Jones agreed to execute the quitclaim deed in favor of Mrs. Edna Morgan, "inasmuch as she did not claim any interest in the land."

Mrs. Edna Morgan testified she had heard Mrs. Jones disclaim any interest in the property. She quoted Mrs. Jones as having said: "I always felt hurt because Mother gave the land to John Lee." Mrs. Edna Morgan also testified that John Lee Morgan claimed ownership of the land prior to the time his deed was executed in favor of A. T. Morgan.

Mrs. Powledge testified that A. T. Morgan exercised the same acts of ownership over the property that any landowner would exercise. On cross-examination she said she once heard A. T. Morgan, in the presence of John Lee Morgan, state that he had bought the farm and was moving back. This was in 1900, a short time before the family actually moved.

Levi Rogers testified it was his "understanding" that A. T. Morgan owned the place; that John Lee Morgan told him he sold it for $300.

Hugh Powledge testified that he lived on the place in 1899; that he rented it from John Lee Morgan for $35 cash, and "A. T. did not claim any of the rent."

There was other testimony to the same effect.

M. G. Wade, cashier and vice-president of First National Bank, El Dorado, testified that A. T. Morgan was one of his customers, to whom a loan was made in 1917 or 1918. The witness said: "In making the loan I investigated to see what property he had. A. T. Morgan always represented that he owned the old Morgan place. As far back as 1917 or 1918 he told me that. I knew it was his place—I investigated the history of it."

Col. C. H. Murphy, president of First National Bank, testified that there was local oil excitement in 1919. A. T. Morgan at that time represented that he owned the place, and executed a lease.

Appellants' theory, presented by a number of witnesses, was expressed by John Lee Morgan, who testified that he claimed only a one-fifth interest. He had never heard of the will, although his mother owned the land at the time of her death. The land was not given to him. It was generally understood that A. T. had a right to

live there. He was manager of the estate and manager of the family. Witness denied making the statement (which appeared in his affidavit) that he acquired the property by will from his mother.

It is our view that a preponderance of the evidence shows that A. T. Morgan lived on the property, or had it cultivated by tenants, from 1900 until 1932—a period of thirty-two years—and that after his death his wife and children had charge of the place. The record is replete with testimony showing the manner in which A. T. Morgan handled the property. He sold the crops, paid taxes, disposed of timber, made improvements, executed an oil lease, and in all respects treated the possession as one vesting exclusively in himself. From 1900 until 1937—thirty-seven years—the so-called "heirs" of A. T. Morgan, Sr., and of Sophronia Morgan, permitted A. T. Morgan to occupy and cultivate the place, and by conduct to hold out to others that he was the owner.

It is true there is no testimony that Morgan ever said to his sister or brothers, or to those claiming through them, "I am claiming this land as my own; I deny your interest in it; take notice of my attitude!" Nothing of this kind occurred; and yet, for more than thirty years, his conduct, his situation, and his actions in dealings affecting the property, were tantamount to a declaration of hostility to the claims of all persons—and "all persons" included those descending from the Morgans.

It is highly improbable appellants were ignorant of what others knew so well. *Edwards* v. *Swilley, ante* p. 633, 118 S. W. 2d 584.

If appellants knew that A. T. Morgan and Mrs. Edna Morgan were claiming the property as their own, to the exclusion of inheritances appellants now seek to establish, then the relationship of co-tenancy terminated when seven years had lapsed after such claim or hostile attitude was brought home to them. We cannot say that at a specific time or place A. T. Morgan, by any particular words, or through conduct expressly hostile to appellants' interest on a designated occasion, brought home to them in a distinctive way that he was denying the rights

they now assert. The record strongly indicates that this could not have been done for the reason that appellants at no time asserted any rights.

By a strained construction it *might* be said that during all this time the claimants remained quiescent and inarticulate; that they were willing to allow A. T. Morgan and his family to occupy the premises as co-tenants with themselves, and that there were reservations in their minds known to their brother by which they expected, some day, to assert the right of entry. But such a construction would be out of harmony with every rule of reason, and contrary to a preponderance of the testimony; and it cannot prevail.

The decree is affirmed.