STEWART *v.* PELT.

4-5504                                                 131 S. W. 2d 644

Opinion delivered June 26, 1939.

. *Seth C. Reynolds* and *McKay & McKay,* for appellants.

*Gaughan, McClellan & Gaughan* and *McRae & Tompkins,* for appellees.

HOLT, J. On April 14, 1938, appellants brought suit in the Lafayette chancery court against appellees seeking to establish interests in a two hundred-acre tract of land in Lafayette county.

The names of appellants are Barney Stewart, Etta Brown, Belle Reid Aulds, John Reid, Rucker Reid, Bessie Carter, Eva Belle Sparrow, Edith Fomby, Sarah Methvin, Lillie Page, Ben Reid, W. A. Moore, Clarence Eugene Moore, minor, and Frankie Moore, minor, by Mrs. Daisy Smith as next friend, Sarah Paralee Bird, O. N. Bird, James W. Massey, Belle Massey, G. C. Hurst, Carrie Smith and Ollie Parker, and the appellees are Louie Pelt, Irin Pelt, Milton Pelt, Minnie Pelt, L. W. Lindsey, Alice Lindsey, Louie Pelt as Administrator of J. D. Pelt and Mary J. Pelt estates, Byron H. Schaff, and Standard Oil Company of Louisiana, a foreign corporation.

The record in this case is so voluminous, containing approximately 575 pages, that it will not be possible, or practical, to make any extended abstract thereof within the compass of this opinion. We shall, therefore, make reference only to what we deem as essential to a decision of the issues involved.

The record reflects that John M. Massey and Seleter Massey, his wife, acquired one hundred and twenty acres of the land in question in 1860, that John M. Massey died intestate in 1862, and that his wife, Seleter Massey, died intestate in 1900, seized and possessed of eighty acres of this land which she acquired subsequent to her husband's death.

Six children, all now deceased, were born to John M. and Seleter Massey, as follows: Caroline Reid in 1847, John C. Massey in 1849, William Henry Massey in 1851, Carson A. Massey in 1854, Wallace Massey in 1856, and Albert Pike Massey in 1858.

After John M. Massey's death, his widow married a Mr. Simmons and to this union in 1866 was born one child, Monroe Massey Simmons. In 1873, W. H. Massey killed his step-father, Simmons, went to Texas and did not return to Arkansas for twenty years.

The record further reflects that many years before the death of Seleter Massey Simmons, the mother, in 1900, the living children had married, moved away, and had families of their own. Some went to Texas and others to Louisiana. There is evidence that Wallace Massey remained on the land with an oral agreement with his sister and brothers that he should have the land in consideration of caring for the mother during her lifetime. The evidence as to this agreement is contradicted.

In 1914, Wallace Massey obtained from his living brothers, J. C. Massey, W. H. Massey and A. P. Massey, a warranty deed covering the full title to the two hundred acres of land in question, and this deed he filed of record November 4, 1915. Prior to the acquisition of this deed he had obtained from appellants, S. B. Stewart, J. W. Massey, Sarah Paralee Bird, J. C. Reid, Mrs. Etta Brown, A. B. Reid, William Henry Reid, Lillie Page, and A. P. Massey, receipts showing the purchase from them of all interests claimed by them in said lands.

Wallace Massey married in 1901 and died in 1915. In 1903, he conveyed by warranty deed 53.77 acres of the land in question to W. R. Altom, being a stranger to the blood. Altom conveyed this tract by warranty deed to Birmingham, and likewise Birmingham to Rowe, Rowe to Force, Force to Lindsey, and Lindsey to Louie Pelt, Pelt being one of the appellees herein.

Wallace Massey and wife, Martha Frances, conveyed part of the land in question to L. W. Lindsey by warranty deed on November 30, 1914. L. W. Lindsey conveyed by warranty deed eighty acres of this land to appellee, Louie Pelt, for $2,500 on December 28, 1929, and recorded this deed on December 28, 1929. This was almost nine years before the institution of this suit.

After the death of Wallace Massey in 1915, his widow, as administratrix, sold his half interest at probate sale to L. W. Lindsey August 31, 1916, and on October 31, 1916, she conveyed her half interest to Lindsey. Wallace Massey and wife had no children. After making

this sale, Wallace Massey's wife moved to Louisiana where she has remained since for a period of nearly twenty-two years.

Lindsey continued in possession and ownership of the remainder of this land, after having disposed of the eighty acres to Pelt, from December 28, 1929, until December 10, 1931, at which time he conveyed by warranty deed to Louie Pelt the remainder of the land in question here for a consideration of $5,000.

During the time that L. W. Lindsey owned the land in question he occupied it, paid the taxes on it, and on five different occasions mortgaged this property to J. D. Pelt and in each instance warranted the title. J. D. Pelt died in 1927. Lindsey's deeds to the property had been duly recorded following their execution. None of the appellants have ever lived on the property in question, have paid no taxes on it, and some of them, though living in close proximity to the property, have never asserted any claim of interest or ownership.

The record reflects that several of the appellants are getting along in years. Belle Reid Auld is 67, Sarah Methvin is 70, Lillie Page is 68, Wallace Massey, Jr., is 62, and Paralee Bird is 63. This is true of many of the witnesses. Thad Eddy is 66, Jim Nix is 69, G. P. Baker is 72, Warren Nix is 82, Sam Force is 83, and John A. Cook is 83.

Prior to the discovery of oil on lands adjoining the property involved in this suit the value of this two hundred-acre tract was variously estimated as being worth from $10 to $15 per acre. Since the discovery of oil, however, on the adjoining lands the value has enormously increased to a point where its present estimated value is from $50,000 to $100,000.

In the court below, appellants (plaintiffs) sought to establish that they were the sole surviving heirs of John M. and Seleter Massey and as such became the owners and are still the owners of certain undivided interests in the lands; that their uncles, Henry, Pike, John and Wallace Massey, acknowledged before and after they had

conveyed their interests in the lands and up to their death their respective interests and shares in said lands and there was a common agreement and understanding among all the heirs, including appellants, that those who remained on the farm should pay the taxes and keep up the improvements for the use of the land; that L. W. Lindsey and appellee Pelt, knew at all times of the interests of appellants, and that the said Pelts have been from the date of the execution of all deeds and mortgages referred to herein, tenants in common with plaintiffs and have recognized continuously plaintiffs' rights in said lands; that B. H. Schaff, lessee, and Standard Oil Company, assignee of said oil lease, knew of plaintiffs' interests in the lands in question. Plaintiffs prayed for cancellation of all deeds, mortgages, and oil leases in so far as they purported to convey, or tend to cloud the title of the plaintiffs (appellants) and that the title of plaintiffs in and to said lands, oil, gas and other minerals be confirmed and established in them.

To this complaint appellees set up a general denial and in addition affirmatively pleaded laches, limitations and adverse possession and prayed for dismissal of the appellants' complaint, that the deeds of appellants to Hurst be canceled and that the title of appellees (defendants below) be quieted and confirmed.

The Chancellor found the issues in favor of appellees, canceled the deeds to appellant, G. C. Hurst, confirmed the titles to the lands in Louie Pelt and Milton Pelt, and the oil and gas lease of appellee, Standard Oil Company of Louisiana, and dismissed the complaint of plaintiffs for want of equity. From a judgment on this decree comes this appeal.

Appellants in their brief clearly state their position and claims in this litigation in the following language:

"That from the death of John W. Massey up until the execution of the deeds by L. W. Lindsey to Louie Pelt, the Massey family, consisting of Seleter Massey, Henry, John, Pike, Wallace and Monroe Massey and the plaintiffs and Mr. and Mrs. Lindsey, occupied and held said

lands as common property, recognizing the title of each other therein and of these plaintiffs; that it was understood by all the Massey family that those who cultivated these lands were to keep up the improvements and pay the taxes for the use of same; and that all acts of ownership were not adverse, but in recognition of the rights of all; that the deeds, mortgages, leases and assignment of leases, while on the face transferred full title, yet it was not so intended by the grantors nor the grantees, the title of plaintiffs remaining in full force down to present time.''

Appellees contend that appellants are barred of any and all claims to said lands by the statute of limitations, laches, staleness of claim and adverse possession.

After a careful consideration of this record, we are of the view that appellees' claim that any interest that appellants may once have had are barred as to a part of the lands by the seven-year statute of limitations (§ 8918, Pope's Digest) and any interest or claim that they may have had to all of the lands in question are barred by laches and the staleness of their claim must be sustained.

This record reflects that five generations appear in the family tree presented in evidence by appellants. Many of the appellants are great-great grandchildren of John M. and Seleter Massey, who originally owned the land involved in this suit. All of the children of John M. and Seleter Massey are long since dead. We have already called attention to the extreme ages of many of the appellants and their witnesses.

Out of these twenty-one appellants not one of them ever lived on the land in question or ever offered to pay any taxes, and some of them had not even been near the land for a great many years. The attitude of some of the appellants, as reflecting their attitude toward these lands, is shown in a brief abstract of their testimony.

Mrs. Belle Reid Auld testified: ''Q. You did nothing at all about it until the land became valuable for oil? A. We were just waiting. Q. And you never came back to see about it? A. No, sir. Q. And you knew

Mr. Pelt was in possession of it? A. Yes, sir. . . . Q. And you did not help Mr. Altom to pay the taxes? A. No, sir. Q. And he had a warranty deed to the land? A. Yes, sir. Q. None of you helped Mr. Birmingham to pay the taxes on this land? A. No, sir. Q. And none of you ever helped Mr. Pelt to pay the taxes on that land? A. No, sir. Q. And you never asked him to pay you anything for the use of the land? A. No, sir. Q. Why didn't you? A. Well, I was living in Louisiana and making a living, and didn't pay any attention to it." She further testified she first knew about the Pelt deed about eight or ten years ago at about the time the deeds were made.

Mrs. Sarah Methvin testified: "Q. So you've been gone fifty-two years? A. Yes, fifty-three, coming October. Q. And since that time you have never paid a cent of taxes on that land? A. No, sir, it was the agreement that the children who stayed on the land, occupied the place, was to keep it up, and pay the taxes. Q. Did that extend to Mr. Pelt, too? A. I don't know whether it did or not. Q. Did you know about Mr. Pelt buying the land? A. Not until about four years ago. Q. that was before oil was discovered in the vicinity of this land? A. Yes, sir. Q. You knew it then? A. Yes, sir. Q. And you did nothing about it? A. I couldn't do anything about it. I was so far away, and I wasn't able. Q. The other heirs, living here at Buckner, didn't do anything about it either? A. No, sir. Q. They found out about it long before you did, didn't they? A. Yes, sir. . . . Q. But when the McKean well came in, they (the heirs) did decide to do something? A. I guess so."

Mrs. Lillie Page testified: "Q. Well, you knew Wallace Massey was dead? A. Yes. Q. And you knew that Aunt Frances, his widow, was appointed administratrix of his estate? A. Yes, sir. Q. To wind up the estate? A. Yes, sir. Q. And you knew she sold some land to pay his debts? A. Yes, sir, I heard she did. Q. You knew that L. W. Lindsey bought the

land she sold at that sale? A. Yes, sir. Q. And you knew that she later sold her interest in the land, her dower interest? A. Yes, sir. Q. And you knew that after she wound up the estate, Aunt Frances Massey moved back to Louisiana? A. Yes, sir. Q. And you knew that L. W. Lindsey took possession of that land and went on to that land? A. Yes, sir. Q. And that was twenty-two years ago? A. Yes, sir. . . . Q. As a matter of fact, none of you paid any attention to this old, poor land up there, until they got oil in the Mc-Kean well? A. Yes, sir, it wasn't worth anything to anybody before.''

Millard Page testified: ''Q. Isn't it the truth of the matter that what started this was the discovery of oil—it waked up these people about the Massey farm? A. It waked up some of them, I reckon. Q. It waked up everybody interested in this lawsuit, didn't it? A. Yes, it waked them up, I reckon.''

Ben Reid testified: ''Q. But you paid no attention to it at all? A. Someone was on the place all the time. Q. But some of them were strangers to the Massey family—strangers to the blood? A. Yes, sir. . . . Q. Even you, and all of the other Massey heirs, neglected this place for the last quarter of a century, until oil was discovered at Buckner? A. Well, it didn't look like it was worth very much, and unless some of the others made a start, I could live without it, and I was just watching it. Q. You say it wasn't worth very much? A. No, sir, not very much.''

Mrs. Belle Massey testified they were not able to do anything because they were poor folks and Mr. Hurst is furnishing the money for the expenses of the litigation.

Mrs. Ollie Parker's testimony was of a similar nature.

Barney Stewart testified: ''Q. Have you ever paid any taxes on this land? A. No, sir. Q. Have you ever exercised any right of ownership over the land? A. No, sir. . . . Q. But you knew that somebody would have to pay the taxes on that land, didn't you?

A. I thought it belonged to L. W. Lindsey, Les Lindsey. Q. He thought it belonged to Les Lindsey, didn't he? A. Yes, sir, he thought he owned it. Q. And Mr. Lindsey thought he owned it, didn't he? A. Yes, sir.''

Martha Frances Massey testified: ''Q. While you didn't see these various receipts, signed, you knew of the existence of such receipts; your husband always kept these receipts, made no effort to get deeds from the parties executing the receipts, and after his death, you delivered these to L. W. Lindsey, who bought the land? A. Yes, sir. Q. You delivered these receipts to Lindsey with other deeds and evidences of title your husband had in his possession, when he died? A. Yes, that's right.''

While a large number of witnesses, including appellants, testified that there was always a general oral understanding among all appellants and those who occupied this property that its occupants should have the use of the land in consideration for its upkeep and the payment of taxes thereon and that appellants' interests should be preserved, there is also much evidence to the contrary, and we cannot say that the chancellor's findings against this contention of appellants are against the preponderance of the evidence.

The record further reflects that Lindsey, Altom, Birmingham, Rowe, Force, J. D. Pelt, and Louie Pelt were all strangers to the blood.

We think it clear on this record that appellee, Louie Pelt's title to the 53.77 acres of land in question acquired by warranty deed on December 28, 1929, is good both by limitation and laches and that the chancellor was correct in so finding. Wallace Massey made a warranty deed in 1903 to this land to W. R. Altom. Altom was a stranger to the blood and that his possession and that of his grantees, Birmingham, Rowe, Force, Lindsey and Pelt, were adverse, is, we think, clearly shown by a preponderance of the testimony.

As to the remainder of the tract, appellants are barred by laches.

As was said by this court in *Horn* v. *Hull,* 169 Ark. 463, 275 S. W. 905: "The doctrine of laches which is a species of estoppel rests upon the principle that, if one maintains silence when in conscience he ought to speak, equity will bar him from speaking when in conscience he ought to remain silent."

An excellent statement of the rule is found in *Sanders* v. *Flenniken,* 180 Ark. 303, 21 S. W. 2d 847: "Mere lapse of time before bringing suit, without change of circumstances or in the relation of the parties, will not constitute laches. Not only must there have been unnecessary delay, but it must appear that, by reason of the delay, some change has occurred in the condition or relation of the parties to the property which would make it inequitable to enforce the claim. So long as the parties are in the same condition, a claim for land may be asserted within the time allowed by law. But when, knowing his rights, a party takes no steps to enforce them until the condition of the other party has, in good faith, become so changed that he cannot be restored to his former state if the rights should be enforced, delay becomes inequitable, and operates as a species of estoppel against the assertation of the right. The disadvantage may come from loss of evidence, change of title, intervention of equities, and other causes; but, when the court sees negligence on one side and injury therefrom on the other, it is a ground for denial of relief. This doctrine has been recognized and applied according to the facts of the particular case in a great many cases by this court. . . .

"Of course, it is equally well settled that, when the question of laches is an issue, the plaintiff is chargeable with such knowledge as he might have obtained upon inquiry, provided the facts already known were such as to put the duty of inquiry upon a man of ordinary intelligence. *Walker-Lucas-Hudson Oil Co.* v. *Hudson,* 168 Ark. 1098, 272 S. W. 836. . . .

"After the changes of situation during all these years, after the changes of title, after the execution of the oil lease and the subsequent discovery of oil, and after evidence of the facts upon which they base their title has

been lost by the death of disinterested witnesses who best knew them, equity will not now enforce a claim which it seems would not likely have been asserted if oil had not been discovered on the land."

The doctrine announced in the above case is re-affirmed in the case of *Steele v. Jackson,* 194 Ark. 1060, 110 S. W. 2d 1, and in 10 R. C. L., p. 399, § 146, the text-writer announced the rule as follows:

"Since laches is generally regarded as being, not delay alone, but rather delay working a disadvantage to another, it is evident that there is and can be no fixed or determinate rule for the application of the doctrine, no exact time, to an hour, a minute, or a year, within which a party's claim to relief, or assertation of a right, is barred by lapse of time, but each case must depend on its own peculiar circumstances. In other words, the question is addressed to the sound discretion of the court. Nor in determining whether a claim is stale is the court confined to the statutory period, but may refuse relief in cases where the delay is less or greater than that named in the statute."

The question of cotenancy relied upon by appellants in support of their claims to said lands, we think, is answered against them in the recent case of *Jones v. Morgan,* 196 Ark. 1153, 121 S. W. 2d 96, and that the principles there announced apply with equal force here. In that case John Lee Morgan, one of five heirs at law, made a deed to his brother, A. T. Morgan, purporting to convey fee title. The brother went into possession, sold the crops, paid the taxes, disposed of the timber, made an oil and gas lease, and in all respects treated the property as his own. This continued for nearly thirty years. Then oil was discovered on nearby lands, and the other heirs brought suit to recover their interests alleging that they were cotenants of A. T. Morgan and that he was only living on the place looking after it as "manager of the estate and manager of the family." In the opinion this court said:

"From 1900 until 1937—thirty-seven years—the so-called 'heirs' of A. T. Morgan, Sr., and of Sophronia Morgan, permitted A. T. Morgan to occupy and cultivate the place, and by conduct to hold out to others that he was the owner.

"It is true there is no testimony that Morgan ever said to his sister or brothers, or to those claiming through them, 'I am claiming this land as my own; I deny your interest in it; take notice of my attitude!' Nothing of this kind occurred; and yet, for more than thirty years, his conduct, his situation, and his actions in dealings affecting the property, were tantamount to a declaration of hostility to the claims of all persons—and 'all persons' included those descending from the Morgans.

"It is highly improbable appellants were ignorant of what others knew so well. *Edwards* v. *Swilley,* 196 Ark. 633, 118 S. W. 2d 584.

"If appellants knew that A. T. Morgan and Mrs. Edna Morgan were claiming the property as their own, to the exclusion of inheritances appellants now seek to establish, then the relationship of cotenancy terminated when seven years had lapsed after such claim or hostile attitude was brought home to them. We cannot say that at a specific time or place A. T. Morgan, by any particular words, or through conduct expressly hostile to appellants' interest on a designated occasion, brought home to them in a distinctive way that he was denying the rights they now assert. The record strongly indicates that this could not have been done for the reason that appellants at no time asserted any rights.

"By a strained construction it *might* be said that during all this time the claimants remained quiescent and inarticulate; that they were willing to allow A. T. Morgan and his family to occupy the premises as cotenants with themselves, and that there were reservations in their minds known to their brother by which they expected, some day, to assert the right of entry. But such a construction would be out of harmony with every rule of reason, and contrary to a preponderance of the testimony and it cannot prevail."

On the whole case, we conclude, therefore, that the findings of the Chancellor are not against the preponderance of the testimony, and no errors appearing, the judgment is affirmed.