MARY T. TARVER ET AL v. ELENA TALIAFERRO ET AL

5-4400                                          423 S. W. 2d 885

Opinion delivered February 12, 1968

*Bridges, Young, Matthews & Davis* and *Carlton Currie,* for appellants.

*Coleman, Gantt, Ramsey & Cox,* for appellees.

LYLE BROWN, Justice. This case orginated as a suit to quiet title to a 483-acre farm in Lincoln County. Elena Taliaferro, widow of M. M. (Mac) Taliaferro, brought the action for herself and the two minor children, claiming under Mac's will. The trial court upheld the will and cancelled that portion of a "Release Deed and Agreement" executed by Mac which was in conflict with the devise. Mary T. Tarver and James H. (Buck) Taliaferro, Mac's sister and brother, appeal.

Mrs. Pearl Taliaferro had four living children, M. M. (Mac), James H. (Buck), Sandy, and one daughter, Mrs. Mary T. Tarver. For the sake of brevity, we shall often refer to the parties by their first names, as did most of the witnesses. The Mother owned substantial properties, mostly farms, in Jefferson, Lincoln, and Cleveland Counties. She was advanced in years. The children were all grown and living in the same general area. The family ties were closely intact. The Mother decided to divide a substantial part of her holdings, by deed, among her four children. She deeded three farms, one to each of the sons. The "big farm" in Lincoln County, the only property here involved, was deeded to Mac. The other two farms were approximately one-fourth the size of the "big farm." In order to more evenly balance the gifts, and at the same time give something of equal value to Mary, the Mother had prepared fifteen interest-bearing notes, each in the sum of $1,000, payable annually. The notes were payable to Mary and were executed by Mac. The deed of the "big farm" to Mac reserved a lien to secure payment of those notes. The Mother had the attorney insert Mary's name as a grantor in the deed, presumably because she thought it would better secure Mary's notes.

The deed and notes were executed respectively by the Mother and Mac in an attorney's office in May 1956. It is not known with certainty whether the deed was then delivered to Mac or whether it was left in the at-

torney's office pending Mary's signature. The Mother, Mac, and the attorney are deceased. In fact, the Mother died within three months. Shortly *after* her death, and on November 15, Mary signed the deed in the same attorney's office. It was recorded the same day.

A second instrument of importance now comes into the case. At the time Mary executed the deed to the 483 acres, Mac instructed the attorney (according to Mary) to draft another instrument. It was styled "Release Deed and Agreement." It was prepared in a matter of days and Mary and Mac returned to the attorney's office and signed it on November 27, along with Mac's wife, who relinquished her dower rights. The instrument had two purposes. The first part of the instrument conveyed lands in Jefferson County in which Mac owned a child's part. The remaining portion of the instrument, which we will refer to as "Agreement," related to the 483-acre farm in Lincoln County. The provisions of the "Agreement" are unique. They provided that should Mac die prior to the retirement of the fifteen one-thousand-dollar notes held by Mary, the unpaid notes would be cancelled and title to the "big farm" would become vested jointly in Mary Tarver and Elena Taliaferro, Mac's wife. On the other hand, should Mac live out the fifteen years and retire the notes, title would vest in Mac and Elena, rather than in Mary and Elena.

Mac Taliaferro's will is the next instrument of significance. For some eight years after the described instruments were executed, Mac lived on and cultivated the "big farm" without incident. He timely paid each note that became due. He executed a will dated April 5, 1965, at a time when he was apparently suffering a terminal illness. Notwithstanding the "Release Deed and Agreement" we have described, Mac bequeathed the farm in trust for the benefit of his wife and children. The trustee was directed to pay one-third of the income to Mac's wife until her remarriage or death, and the balance to his two children. Upon death or remarriage of

the wife, title would vest absolutely in the children. Mac designated his sister, Mary Tarver, as trustee to serve without bond.

Mary Tarver qualified as executrix and trustee and administered the estate for more than a year. Some thirteen months after her appointment, Mary filed her first and final accounting. In those instruments she listed the "big farm" and recited that Mac's estate owned a *one-half* interest in those lands, not the *entire* interest recited in his will. The owner of the other interest was not named but it is undisputed that Mary was asserting that she in fact owned the other interest under the terms of the "Release Deed and Agreement." Her accounting to the court was for a one-half interest.

Mac's widow, Elena, filed an objection to the accounting and at the same time filed this suit to quiet and confirm title in her husband's estate. It was the opinion of the trial court that Mary was estopped from claiming any interest in the farm under the terms of the "Agreement" which Mac executed in her favor. Of course it is her contention that since seven of the annual notes had not been paid when Mac died, she therefore became vested with a one-half interest. These factors are advanced in support of the trial court's finding:

(a) Mary Tarver's petition for appointment as executrix recited that the deceased owned the 483-acre tract; (b) with court approval Mary leased the entire acreage in her capacity as executrix; (c) the "Agreement," if valid, would have passed title directly to Mary and Elena, hence no interest in the land would have been included in Mac's estate; (d) Mac ignored the "Agreement" when he made his will, and his nomination of Mary as executrix and trustee would indicate a common understanding between Mary and Mac about the status of the "Agreement"; (e) Mary Tarver never surrendered, or tendered, the seven unpaid notes; (f) when Mary filed the estate tax return she showed a one-half interest to be vested in Mac's estate, contrary to the pro-

vision in the "Agreement" which would have vested the title in Mary and Elena jointly; (g) the estate was administered for thirteen months before Mary formally asserted her claim to one-half interest; (h) Mary was acting in a fiduciary capacity and the logical procedure would have been to assert her own rights rather than follow a pattern indicating that she made no claim under the "Agreement"; (i) had Mary been claiming any interest it is unreasonable to believe that she would not have so advised her counsel, whereupon he certainly would have adjusted her course of action; and (j) the attorney was aware of the "Agreement."

Let it be emphasized that we are not here dealing with the law of estoppel in the strict sense. Estoppel involves the conduct of both parties. The fault of one party induces the other to detrimentally alter his position. The problem at hand may be more likened to a waiver. Specifically, by accepting the trusteeship under the will and proceeding to act, did Mrs. Tarver waive her right to claim under the "Agreement"?

In resolving Mary Tarver's rights in this premise we are not aware of a controlling case in our own jurisdiction. The basic relationship between the trustee and his beneficiaries is thoroughly discussed in *Hardy* v. *Hardy,* 222 Ark. 932, 263 S. W. 2d 690 (1954). As concluded in *Hardy,* the law demands of the trustee a high standard of loyalty in his fiduciary capacity. The reason for that well accepted rule is stated in Bogert, *Trusts,* 2d Ed. § 543 (1960), as a recognition that it is practically impossible for the same person to act fairly in two capacities and on behalf of two interests in the same transaction. "If one of the interests involved is that of the trustee personally, selfishness is apt to lead him to give himself an advantage." Bogert concludes that the courts deem it wiser to invoke a hard and fast rule against such service (absent prior approval of the court) rather than attempt "to separate the harmless and the harmful by permitting the trustee to justify his representation of two interests."

Perry, *Trusts and Trustees,* Vol. 1, § 433 (1929). states the rule thusly:

> "Under no circumstances can a trustee claim or set up a claim to the trust property adverse to the *cestui que trust.* Nor can he deny his title. If a trustee desires to set up a title to the trust propery in himself, he should refuse to accept the trust."

To the same effect see 90 CJS *Trusts* § 181; *Power* v. *Jones,* 333 P. 2d 34 (Calif. 1959); and Loring, *Trustee's Handbook* (5th Ed. 1940) § 18, stating that if the trustee has an adverse interest when he accepts the trust, that interest cannot be set up against the trust. We hold that Mary is precluded from claiming an interest in the "big farm" under the title purportedly passed to her by the "Agreement."

The chancellor approved the lien created by the deed from Mrs. Taliaferro and Mary to Mac and represented by the seven notes unpaid at the time of Mac's death. That finding is not here questioned, and of course we do not disturb it.

Appellant James H. (Buck) Taliaferro contends Mac's deed was not effective because it was not delivered during the life of the grantor mother. Buck reasons that since Mac's title fails, the latter remained in posession as a co-tenant of his brothers and sister, entitling Buck to a one-fourth interest in the property.

With respect to Buck's contention, any defect in the delivery of the deed would be immaterial because it is clear to us that Mac's title ripened by adverse possession. Mac's deed was recorded November 15, 1956, at which time he was occupying the land with his family. There he continued to reside until his death in 1965. During those years a well was put down; the old house was replaced with a new one; abandoned tenant houses were razed and out-buildings were erected; land was cleared;

timber was sold; the taxes were paid by Mac; and Mac was commonly recognized in the community as being the owner. Buck lived in the same area and frequently passed the farm. Buck testified that his mother related that she was giving the "big farm" to Mac and the latter was to pay Mary $15,000. Further, he testified that he considered Mac to be the owner. Under all those circumstances it became unnecessary for Mac to specifically exclaim to the world that he was holding adversely. *Jones* v. *Morgan,* 196 Ark. 1153, 121 S. W. 2d 96 (1938).

Finally, Buck contends that the "post-mortem execution and delivery of the deed" was concealed from him and that concealment should defeat a claim of adverse possession. There are two answers to that proposition. First, the record does not disclose whether the deed was left in the attorney's office when Mrs. Taliaferro executed it, or whether Mac took it home and put it in his safe. Second, there is not a scintilla of evidence that Mac made an intentional concealment. Mac's good faith is not seriously questioned even by Buck. Intentional concealment is a prerequisite to the sustaining of Buck's premise. *Landman* v. *Fincher,* 196 Ark. 609, 119 S. W. 2d 521 (1938).

Numerous points not here recited are raised by the parties; however, the rulings herein make it unnecessary to resolve the other issues.

Affirmed.

HARRIS, C. J., and BYRD, J., not participating.