·SMITH *v.* KAPPLER.

4-9680                                    245 S. W. 2d·809

Opinion delivered February 11, 1952.

*Lee Seamster, E. J. Ball* and *Hubert L. Burch,* for appellant.

*Jeff Duty* and *Rex W. Perkins,* for appellee.

ROBINSON, J.   In January, 1920, the wife of W. H. (Uncle Billy) Smith died testate, leaving to her husband

a life estate in the home place in Benton County, consisting of about 42 acres, and the remainder to her sons Euell and Roy, with the provision that Euell and Roy should pay to Emma and Bertha, daughters of the testatrix, $400 each, and $200 to Walter, another son. Subsequently, Euell and his wife, Zola, deeded their interest in the property to Emma, who is the wife of Adolph Kappler, one of the appellees herein. At a later date Bertha and Walter deeded their interest to Emma. At that time Emma endeavored to get Roy to convey his interest to her as consideration for Emma supporting their father, Uncle Billy, for the balance of his life, but Roy declined to do so.

About 1933, Uncle Billy moved into the home of the Kapplers, which is not situated on the land here involved, where he lived until his death in January, 1950. A few months after Uncle Billy's death, Roy filed this suit claiming a one-half interest as a remainderman under the will of his mother. Appellees, the Kapplers, say that they now own all interest in the land, claiming Roy's part by adverse possession. The Chancellor held with the Kapplers, and Roy has appealed.

From 1920 until 1940, various people lived on the property as tenants of Uncle Billy. The property forfeited for non-payment of taxes for the years 1934 and -35. It was redeemed by the appellee Kappler, who sought Roy's aid in redeeming, but, although Roy at first promised to help pay for the redemption, he never did pay anything and finally flatly refused to do so.

In 1937 the property again became delinquent and was sold to the State for taxes due for that year. Kappler bought the land from the State in 1940, obtaining a State deed to it, which he had recorded. That same year, 1940, Kappler placed his son Gene on the property as a tenant, and Gene and his wife have lived there since that time.

Appellees sought to introduce in evidence a decree of the Benton Chancery Court rendered on March 5, 1942, and entered *nunc pro tunc* as of March 19, 1940, confirm-

ing title in the State. The court held the decree inadmissible, but it was made a part of the record. We see no valid objection to it being admitted in evidence, since it is evidence of the fact that the State had title to the land at the time it was sold to Kappler. Incidentally, no attack is made on the validity of the tax sale.

Ordinarily, a remainderman, since he has no right of possession, cannot lose his interest by adverse possession during the lifetime of a life tenant for the very simple reason that one must have the right of entry before another can hold adversely to him. *Hayden* v. *Hill*, 128 Ark. 342, 194 S. W. 19. But, the property can be lost to both the life tenant and the remainderman by failure to pay the taxes. § 84-925, Ark. Stats., provides:

"If any person who shall be seized of lands for life or in right of his wife, shall neglect to pay the taxes thereon so long that such lands shall be sold for the payment of the taxes, and shall not within one year after such sale redeem the same according to law, such person shall forfeit to the person or persons next entitled to such land in remainder or reversion, all the estate which he or she, so neglecting as aforesaid, may have in said lands, and the remainderman, or reversioner, may redeem the lands in the same manner that other lands may be redeemed after being sold for taxes; and moreover, the person so neglecting as aforesaid shall be liable in an action to the next entitled to the estate for all damages such person may have sustained by such neglect."

In *Higginbotham* v. *Harper*, 206 Ark. 210, 174 S. W. 2d 668, Mr. Justice McHANEY, speaking for the court, said: "Here the duty rested upon appellant, the life tenant, to pay all general taxes, § 13813 Pope's Digest [now § 84-925, Ark. Stats.], and all special assessments, *Crowell* v. *Seelbinder*, 185 Ark. 769, 49 S. W. 2d 389, 83 A. L. R. 788, * * * to protect his own interest and that of the remainderman. His failure to pay the drainage district tax on betterments resulted in a sale to the district. His failure to redeem from such sale within the time provided, resulted in an extinguishment of his title as well as that of appellee in remainder, assuming a valid sale,

and forced appellee to purchase from the district to protect his remainder interest. To declare the forfeiture in this case here worked equity, protected the rights of appellee, and did no harm to appellant as he had already lost title by failing to redeem, and it became a means of enforcing appellee's equitable rights.''

In the case at bar, the life tenant did not redeem the property within one year after it was sold for non-payment of taxes. Any remainderman had the right to redeem, and when redeemed by a remainderman the life tenant had no further interest. The life tenancy then and there terminated. It had fallen in. Uncle Billy lost all interest in the property.

Kappler, being the husband of Emma, one of the remainderman, stood in her shoes, and his purchase from the State amounted to a redemption for the benefit of all the remaindermen. *Zachery* v. *Warmack,* 213 Ark. 808, 212 S. W. 2d 706; *Smith* v. *Smith,* 210 Ark. 251, 195 S. W. 2d 45.

Kappler pleaded title by adverse possession and, of course, had the burden of proving this affirmative defense. While it is possible for a tenant in common to acquire title by adverse possession, we said in *Hardin* v. *Tucker,* 176 Ark. 225, 3 S. W. 2d 11: ''In order for the possession of a tenant in common to be adverse to that of his cotenants, knowledge of his adverse claim must be brought home to them directly or by such notorious acts of unequivocal character that notice may be presumed.'' In the case at bar we think Kappler's proof to be deficient in failing to establish that his possession was actually under a claim of ownership and in failing to show that notice of such a claim was brought home to Roy Smith.

First, the adverse character of the possession— since each tenant has an equal right to the possession of land held in common, the fact of possession alone is insufficient to supply the necessary element of hostility. To show that his possession was under a claim of right, Kappler relies upon the fact that he paid the taxes every year and made improvements upon the property. As to

the tax payments, Kappler was receiving the rents from the property to the exclusion of his co-tenant, and as between the two it was obviously his duty to pay the taxes. As to the improvements, the record is completely silent as to whether any of these improvements were made more than seven years before this suit was filed. Since Kappler had the burden of proof, it was incumbent upon him to supply this information.

On the other hand, there is convincing evidence that Kappler did not regard himself as the owner, as both he and his wife recognized Roy Smith's title during the period of asserted adverse possession. In 1944 Emma Kappler bought the interest of Walter and Bertha in consideration of her agreement to support the parties' father for the rest of his life, and she asked Roy to join in the deed upon these terms. It is evident that Emma would not have assumed this undertaking in return for the conveyance had she believed that her husband already had complete title to the property in which case the deed would have conveyed nothing. Roy testified that after Uncle Billy's death Kappler ''offered to buy my part of it, or call it off, and we would even divide.'' According to Roy, Kappler offered him $500 for his part, the same as he had given Euell for his part. Kappler admits having talked to Roy's attorney and quotes himself as having said: ''All I have got is a State deed.'' Hence, we think the evidence clearly preponderates against the contention that the possession was hostile.

Second, the bringing home of notice to Roy—To establish adverse possession against his co-tenant Kappler had the burden of proving either that he brought notice home to Roy or that his conduct was so open and unequivocal that Roy should have known of the hostile claim. On neither issue is Kappler's proof convincing. Although Kappler is Roy's brother-in-law and the two saw each other from time to time, Kappler did not testify that he ever told Roy that he claimed the land as his own. Roy testified that he did not learn of Kappler's tax deed ''for quite a little bit after he bought it,'' and that he did not know whether Kappler was claiming the land

under the deed, or as a tenant. And, even if Roy were shown to have known of the deed on the date of its execution, still the law treats the transaction as a redemption; so, something more would be required to warn Roy that Kappler considered it a purchase of the fee.

Nor was Kappler's hostile possession demonstrated by notorious and unequivocal conduct. After Uncle Billy moved to the Kappler home in about 1933, various people occupied the house on the land now in controversy. Euell lived there for several years and three or four families rented the land from Uncle Billy. Kappler now contends that his adverse possession began when his son Gene moved into the house in 1940, but we cannot see why Gene's occupancy was unequivocally referable to Kappler's purchase from the State. From Roy's point of view possession of the land was changing frequently as tenants moved in and out. Gene moved on the land at a time when Uncle Billy was living in the Kappler home and apparently before Roy ever heard of the State deed. To hold that Gene's occupancy alone was an unequivocal act of hostility would require us to say (a) that Roy then knew of the tax deed, though the proof is that he did not, and (b) that Roy should at once have concluded that Gene was his father's tenant, that Kappler, Sr., had decided to cut off his father-in-law's life estate at a time when Uncle Billy was living in the Kappler home, and that Kappler, Sr., had also decided to repudiate the half interest that was indisputably vested in Roy, his brother-in-law. In these circumstances it cannot be said that Gene's occupancy of the property was such a clearly adverse maneuver that Roy should have realized that a hostile claim of title was being asserted.

We conclude that the appellant's prayer for partition should be granted. The appellee's position is not without equity, however, as he has undoubtedly made improvements upon the property. Upon remand of the case he should be given the benefit of these improvements, either by setting them aside to him if the division is in kind or by awarding him the enhanced value of the

property by reason of the improvements if the partition is by a sale. *Dunavant* v. *Fields,* 68 Ark. 534, 60 S. W. 420; *Dobson* v. *Oil & Gas Commission,* 218 Ark. 160, 235 S. W. 2d 33.

Reversed with directions to enter a decree not inconsistent with this opinion.