HAROLD UTLEY ET UX *v.* DAVID RUFF

73-171                                    502 S.W. 2d 629

Opinion delivered December 24, 1973

*Williams & Gardner,* for appellants.

*James K. Young,* for appellee.

J. Fred Jones, Justice. This is an appeal by Harold Utley and wife from a chancery court decree vesting title to a triangular piece of land in David Ruff by adverse possession. For the purpose of clarifying the issues on this appeal, the appellee Ruff is the unquestioned owner of a two acre plot of land in Pope County described as follows:

"Part of the NE¼ of the NW¼ of Section 34, Township 9 North, Range 20 West described as beginning at a point 856 North of the Southwest corner of said NE¼ of the NW¼, run North 330 feet; thence East 240 feet; thence South 330 feet; thence West 240 feet to the point of beginning."

The appellant Utley holds record title to land in the NW¼ of the NW¼ of Section 34 adjacent to, and immediately west, of Mr. Ruff's land. State Highway No. 7 runs in a southeasterly direction across the east side of the NW¼ of the NW¼ of Section 34 and this litigation concerns the ownership of that portion of the NW¼ of the NW¼ lying east of the highway and between the highway and Ruff's two acre tract in the NE¼ of the NW¼. Utley claims it under the deed record title and Ruff claims it by adverse possession. The litigation arose when Utley built a fence along the east boundary line of the NW¼ of the NW¼ between Ruff's described land and the highway, and Ruff filed suit in chancery for removal of the fence alleging that he had acquired title to the land between Utley's new fence and the highway by adverse possession. Of course Ruff assumed the entire burden of affirmatively proving his title by adverse possession. The chancellor found in favor of Ruff, but on trial de novo we are of the opinion that the chancellor's findings and decree are against the preponderance of the evidence.

There were two survey plats made and prepared by surveyor Ragsdale and one made and prepared by surveyor Orton placed in evidence. These survey plats differ as to the exact location of Highway 7 in relation to the Ruff two acre tract. Ragsdale admitted that his surveys did not accurately locate the highway in relation to the Ruff land as they were not made for that purpose. All the sur-

veys substantially agree as to the location of the division line between the northwest of the northwest and the northeast of the northwest, so that line in relation to the highway becomes immaterial since Ruff claims by adverse possession all the land between the west boundary line of his two acre tract and the highway. The chancellor accepted the Orton survey and we see no reason to discuss the accuracy or differences in the surveys.

The law on adverse possession is well established in Arkansas, but the difficulty arises in applying the law to the facts established by evidence in a given case. The evidence in the case at bar is rather clear that Ruff's two acre tract has never been enclosed by fence and has not been in cultivation since about 1927. It is also clear that the portion he claims by adverse possession has never been in cultivation or enclosed by fence.

Title to land by adverse possession does not arise as a right to the one in possession; it arises as a result of statutory limitations on the rights of entry by the one out of possession. Possession alone does not ripen into ownership, but the possession must be *adverse* to the true owner or record title holder before his title is in any way affected by the possession, and the word "adverse" carries considerable weight. With the exception of saving clauses in favor of minors and insane persons, Ark. Stat. Ann. § 37-101 (Repl. 1962) reads as follows:

> "No person or persons, or their heirs shall have, sue or maintain any action or suit, either in law or equity, for any lands, tenements or hereditaments but within seven [7] years next after his, her or their rights to commence, have or maintain such suit shall have come, fallen or accrued: and all suits, either in law or equity, for the recovery of any lands, tenements or hereditaments shall be had and sued within seven [7] years next after title or cause of action accrued, and no time after said seven [7] years shall have passed."

This statute does not say or mean that one in possession of land for seven years thereby obtains title to it.

The statute simply says and means that when one is in possession of land, no one may question his claim of ownership except within seven years after the cause of action first accrues. So in any case of adverse possession the primary questions are, when did the possession become adverse and when did the cause of action accrue. These questions have been before this court in many cases.

There is some difference between adverse possession under color of title and adverse possession where there is no color of title. The primary difference is that in the absence of color of title possession is limited to the land *actually occupied* (sometimes referred to as "pedal possession"); whereas in adverse possession under color of title, the actual possession, by presumption of law, is constructively limited to the instrument which provides color of title. *Dierks Lbr. & Coal Co.* v. *Vaughn,* 131 Fed. Supp. 219; *Bradbury* v. *Dumond,* 80 Ark. 82, 96 S.W. 390; 11 L.R.A. (N.S.) 772.

One of the cardinal principles of adverse possession in order that it may ripen into ownership is that the possession for seven years must have been actual, open, notorious, continuous, hostile and exclusive, and it must be accompanied with an intent to hold against the true owner. *Terral* v. *Brooks,* 194 Ark. 311, 108 S.W. 2d 489; *Stricker* v. *Britt,* 203 Ark. 197, 157 S.W. 2d 18; *Montgomery* v. *Wallace,* 216 Ark. 525, 226 S.W. 2d 551.

*Culver* v. *Gillian,* 160 Ark. 397, 254 S.W. 681, was an adverse possession case without color of title. The adverse claimant submitted proof that he put up a sign on the property forbidding trespassers from coming there; that at one time he had underbrush cleared and some of the larger trees cut down; that one year he planted some garden seed on the property, and that within the statutory period he enclosed and rented a part of the land. In holding the evidence insufficient to establish title by adverse possession, this court said:

"[T]o constitute an adverse possession, there need not be a fence or building, yet there must be such visible and notorious acts of ownership exercised

over the premises continuously, for the time limited by the statute, that the owner of the paper title would have knowledge of the fact, or that his knowledge may be presumed as a fact. In other words, it has been well said that if the claimant 'raises his flag and keeps it up,' continuously for the statutory period of time, knowledge of his hostile claim of title may be inferred as a matter of fact.

In the present case it may be said that, under the circumstances shown by the defendant himself, there has been no actual, visible, hostile appropriation of the lots, to the exclusion of the owner of the paper title, continuously for seven years. The lots were un-inclosed and unimproved. There was no actual continuous use of the lots by the defendant of such un-equivocal character as to reasonably indicate to the owner that the defendant was making a hostile claim to the lots. *Norwood* v. *Mayo,* 153 Ark. 620.

The defendant claims to have gone into possession of the lots in 1907 and to have held adverse possession ever since. He describes his adverse possession, how-ever, and it is not of such a substantial character as to give him title to the lots. At one time he had the underbrush cleared and some of the larger trees cut down. One year he planted and cultivated a few gar-den seed. He did nothing from that time until the suit was brought, except that, in 1917, a part of the lots were inclosed and rented. It is true that, in the beginning, he put up a sign on the lots forbidding trespassers from coming there. This of itself would not be sufficient to show adverse possession of the lots against the true owner. It is not even shown that the sign remained posted up continuously for seven years. Therefore we hold that, under his own testi-mony, the defendant did not acquire title to the lots by adverse possession."

In *Coons* v. *Lawler,* 237 Ark. 350, 372 S.W. 2d 826, we pointed out that to prevail on a claim of adverse pos-session not under color of title one must show actual or pedal possession to the extent of the claimed boundaries,

and in that case the acts of the plaintiff in constructing a septic tank, filling in a low place on the disputed strip, parking trailers on the property at irregular intervals, planting a row of trees on the property and building a boat dock, fell short of that adverse possession required for a trespasser's claim to ripen into title.

We have also held that seasonable cultivation of patches on unenclosed and undefined lands, without color of title, is insufficient to constitute the continuous, pedal, and actual possession to the extent of the claimed boundaries for the seven years that the law requires of an adverse possessor. *Hill* v. *Surratt*, 240 Ark. 122, 398 S.W. 2d 225. See also *Dierks* v. *Vaughn*, 131 Fed Supp. 219, affirmed 221 Fed. 2d 695 and the Arkansas cases therein cited.

To constitute effective *adverse* possession the possession must be continuous for the full period; if there is a break in the continuity, the adverse holding before and since the break cannot be tacked in computing the period of limitations. *Brown* v. *Hanaver*, 48 Ark. 277, 3 S.W. 27; *Nicklace* v. *Dickerson*, 65 Ark. 422, 46 S.W. 945. See also *Byers* v. *Danley*, 27 Ark. 77; *Pulaski County* v. *State*, 42 Ark. 118.

As already stated, Mr. Ruff had the burden of establishing his claim of title by adverse possession, so we now examine the evidence most favorable to his claim. Mr. Ruff identified a redemption deed to his grandfather, D. P. Ruff, dated in 1896 calling for "Pt NE NW Sec. 34 Twp. 9 Range 20—2 acres." He said he interited the property as the last of the family In pointing out the land in litigation from an aerial photograph, Mr. Ruff said:

"This little triangle angle right here, Northwest, Northwest, and my property runs to these trees. There is some very large old trees right here that we use to use for shade when we was working there. We use to rent it out and turned off the road and came down here and angled into that property. About where the line between the Utley property use to be the Carter place and our property joins. Angled into that over this little triangle."

Mr. Ruff said he had always regarded the highway as his west line. He said the south, east and north sides of his property had been fenced but there had never been a fence completely around it. He said the fence along his north line came out to where the trees stopped 30 or 40 feet from the highway. He said potatoes and cotton were raised on his "little patch" until about 1927 when he went into the Navy. He said he never knew of anyone claiming the property here involved until Utley erected his fence in 1970. He said that prior to 1970 he did not know where the quarter section lines were; that the highway had been moved from its previous location but that he had always claimed his land as extending to the highway. Mr. Ruff then testified as follows:

"Q. What is the description on your redemption certificate?

A. Well, it only shows 3 acres. 34, 9, 20. Part of the Northeast, Northwest.

Q. Now, are you claiming any property of the Northwest, Northwest?

A. Yes, sir.

Q. And how did you get title to that?

A. Adverse possession.

Q. And I take it you never had any deed or any other evidence of title?

A. No, sir.

Q. Have you fenced that property?

A. No, sir.

Q. You didn't fence it along the edge of the road?

A. No, sir, Mr. Utley did that for me.

Q. Well, was there ever a fence running on your property line that would be your west property line?

A. Not to my knowledge.

Q. You don't recall any?

A. I don't recall any fence being on the west side of our property."

Mr. Ruff said he had two surveys made of his property and both surveys found his southwest corner to be in the highway. He said his two acre tract was located in the northeast quarter of the northwest quarter and he did not claim any property in the northwest of the northwest except the little triangle by adverse possession.

"[W]e just went across it, in an out of the property, as a good, easy natural place coming down from Dover with equipment. That was the first place you approached the property, and we just angled off the road into it by those big trees."

Mr. Lawrence Campbell testified that he is 78 years of age and has been familiar with the Ruff land for about 60 or 70 years. He said he attempted to purchase the property at one time from Mrs. Elizabeth Ruff but she could not make up her mind about selling it. He said he always assumed the Ruff family owned the property, and never did hear of anyone else claiming it. He said he never did know where the property lines were located; that he didn't get that far along in his negotiations with Mrs. Ruff to inquire as to the property lines; that he assumed the Ruff property extended west to the highway, but never did hear anyone claim one way or the other as to the property lines.

Mr. Newton Powers testified that about 1920 the Ruff two acres was planted in sweet potatoes. He said he plowed the potatoes up and stored them in working out a doctor's bill he owed to Mrs. Ruff's brother. He said he never heard of anyone claiming title to the land involved, and did not hear of Ruff claiming title to it until the past few days.

John Page testified that he was the administrator of the Carter estate (Utley's grantor); that he never did know the exact location of the south line of the Carter property, but knew that Ruff claimed some property south of the Carter property. He said he also tried to purchase the property from Mrs. Ruff for a filling station. He said he understood that the Ruff property extended to the road but that he didn't know where the lines were and that he doesn't remember Mrs. Ruff telling him it extended to the road.

County Judge Grant testified that he was originally in the real estate business and had an open listing to sell all of Mr. Ruff's land. He said he had one prospective purchaser for the land here involved, but after a survey by Mr. Ragsdale indicated that about half of the property fronted on the highway, the prospective purchaser refused to buy, because he wanted all the highway frontage.

Chancellor Richard Mobley testified that in 1961, before he was elected chancellor, he represented the Carter heirs in partitioning their property, a part of which was later sold to the appellant Utley. He said he had also represented the Ruffs from time to time and it was his understanding that both the Utley land and the Ruff two acres were bounded on the west by Highway 7. He said he never did hear of anyone making claim to any property east of the highway adjacent to the Ruff property. He said he prepared the deed of conveyance from Carter to the appellant Utley and included in the description: "All of the Northwest quarter of the Northwest quarter of Section 34, Township 9 North, Range 20 West, lying East of State Highway 7." He said there was some question as to the exact acreage owned by the Carters and this description was included in the deed to make sure that Utley would receive everything the Carters owned. He said he prepared the deed from the description in the abstract of title and the name "Ruff" was not mentioned in the abstract.

Mr. Ragsdale testified that he made a survey of the Carter land as testified by Chancellor Mobley but his

testimony adds nothing in support of adverse possession of the land here involved. He did say the property was grown up in bushes and trees and did not appear to have been in use for a long time.

Mr. Ruff, on recall, testified that he had paid taxes on two acres in the *northeast* of the northwest since 1896. He said that when he went into the Navy in 1927, the two acre tract had been in cultivation as far back as he could remember. He then testified as follows:

"Q. When did you go in the navy?

A. January 22, 1927.

Q. Did you cultivate it?

A. Yes, sir.

Q. What crops did you raise on it?

A. Cotton.

Q. How far out did you come? Did you come to the road?

A. No, we came to the big trees that is setting just about on that quarter section line on the west side of our property. *This little triangle that continues out to the road, we merely used that to go in an out of the property.*

Q. Is that where you parked your team?

A. That's right. Not only myself, but the renters that we rented that land in successive years. There is one particular large tree there and they parked their team and wagon when we were chopping cotton and picking cotton. We would take the teams there with a cultivator and cultivate it.

Q. But for a period of ten to fifteen years this was in cultivation?

A. More than that I'm sure.

Q. By cultivation, do you mean row crops?

A. Cotton and potatoes that I know of. Dr. Truette, my second uncle, rented it for many years from my grandmother and planted sweet potatoes in there.

Q. Is that the sweet potatoes Mr. Powers was talking about?

A. That's correct. He worked it with day labor to collect some of his fees. The farmers owed him money and they would come in and do the work." (Emphasis added).

Mr. Utley testified that he purchased and claims the property here involved in the northwest quarter of the northwest quarter of the section. He and surveyor Orton testified that the property was grown up in trees, vines and undergrowth to the extent that a bulldozer was employed for the purpose of clearing the property line for the purpose of a survey. The both testified they found an old fence row consisting of some posts and old wire running north and south for some distance from the north line of the property and about ten feet west of the true boundary line between the northeast quarter and the northwest quarter of the section. Mr. Utley said he built his fence on the true boundary line as established by Orton's survey. We cannot say that the chancellor erred in accepting Orton's survey as establishing the true division line between the northwest quarter and the northeast quarter of section 34 here involved.

The record indicates that the chancellor may have viewed some of Utley's testimony as to his own exercise of dominion and rights of ownership over the property involved with considerable skepticism and for good reason. But the burden was on Ruff to prove his own title by adverse possession as previously defined in the decisions, *supra*. Mr. Ruff recognized his burden in this regard and readily assumed it, but as we view the record, he fell far short of proving adverse possession. He simply proved by several witnesses that they assumed his land

extended west to Highway 7 and had never heard anyone claim that it did not. According to Mr. Ruff's own testimony, he had always considered the highway as being the west boundary of his two acre tract. His testimony was straightforward and carries the ring of truth, but it falls far short of the proof required. He simply says in substance that his two acres in the northeast of the northwest were in cultivation prior to 1927 and the workers, while attending crops on the land, parked wagons and ate their lunches under a tree on the edge of the property here involved. He denied knowledge of any fence ever existing north and south on the west side of his property and said that he only used the property here involved in gaining access to the two acres in cultivation. Of course, use of a passageway over property of another does not affect title to the property outside the passageway and by the same token, the right to a passageway over the property of another is not dependent upon adverse possession of all the property over which the passageway extends.

As already pointed out, for Mr. Ruff to have prevailed in this case, it would have been necessary for him to have proven actual acts indicating his claim of ownership in the possession of the land involved, otherwise the true owner would never know that anyone was claiming adversely and the true owner's cause of action would not accrue until he did have actual or constructive knowledge or notice that his land was being claimed by another. The possession in order to ripen into ownership must be actual, open, notorious, continuous (for seven years), hostile, exclusive, and accompanied by an intent to hold against its true owner.

The decree is reversed.

HARRIS, C.J., not participating.