Myrtle (Harvell) MARTIN, Martha (Harvell)
SIMS et al *v.* CERTAIN LANDS LYING IN IZARD
COUNTY, Arkansas and L. A. HARVELL

CA 82-450                                 656 S.W.2d 713

Court of Appeals of Arkansas
Opinion delivered September 14, 1983

*L. Gray Dellinger,* for appellants.

*Blair & Stroud,* by: *Robert D. Stroud,* for appellees.

DONALD L. CORBIN, Judge. Appellee, L. A. Harvell, filed an action to quiet title to 120 acres of land situated in Izard County, Arkansas. Appellants intervened claiming that they, together with appellee, were tenants in common having derived their ownership by intestate succession. Appellee alleged he had acquired their interest by adverse possession. The chancellor found for appellee on the basis of adverse possession. We affirm.

For reversal, appellants contend that the chancellor's findings and decree are against the preponderance of the evidence in that the proof was insufficient to establish adverse possession by one tenant in common against another tenant in common.

The general rules for establishing title by adverse possession are set out in many Arkansas cases. In the case of *Utley* v. *Ruff*, 255 Ark. 824, 502 S.W.2d 629 (1973), the Supreme Court stated:

> Title to land by adverse possession does not arise as a right to the one in possession; it arises as a result of statutory limitations on the rights of entry by the one out of possession. Possession alone does not ripen into ownership, but the possession must be adverse to the true owner or title holder before his title is in any way affected by the possession, and the word 'adverse' carries considerable weight . . . One of the cardinal principles of adverse possession in order that it may ripen into ownership is that the possession for seven years must have been actual, open, notorious, con - tinuous, hostile and exclusive, and it must be accom - panied with an intent to hold against the true owner.

The law on adverse possession as to tenants in common is set forth in the case of *Coulson* v. *Hillmer*, 271 Ark. 890, 612 S.W.2d 124 (Ark. App. 1981), as follows:

> In *Dodson* v. *Muldrew*, 239 Ark. 202, 388 S.W.2d 90 (1965), the Court refers to the rule in *Singer* v. *Naron*, 99 Ark. 446, 138 S.W. 958, an earlier case with approval.

> The reason is that possession of one tenant in common is *prima facie* the possession of all, and the sole enjoyment of rents and profits by him does not necessarily amount to a disseizin. Hence, for the possession of one tenant in common to be adverse to that of his co -tenants, knowledge of his adverse claim must be brought home to them directly or by such acts that notice may be pre - sumed. In order for the possession for the tenant in common to be adverse to that of his co -tenant, knowledge of his adverse claim must be brought home to them directly or by such notorious acts of unequivocal character that notice may be pre - sumed.

Between tenants in common there is also a fiduciary relationship, for they stand by operation of law in a confidential relation to each other, as to the joint property, and the duty is imposed on them to protect and secure their common interests. *Hendrix v. Hendrix,* 256 Ark. 289, 506 S.W.2d 848 (1974).

The parties in the instant case stipulated that Samuel Wilson Harvell died in 1913 seized and possessed of 120 acres and that he had nine children, all of whom were deceased except appellee L. A. Harvell and Martha Sims, one of appellants.

The record reflects that L. A. Harvell lived contin - uously on the property from 1913 to 1946. He moved to adjoining property in 1946 but continued to use the land up to the present time, a total of 69 years. It was undisputed that appellee had sole possession of the property since 1913.

The record further reflects that there was a debt secured by a lien on the property at the time of Samuel Wilson Harvey's death in 1913. Appellee testified that he talked with his four brothers, now deceased, and they agreed that if appellee would pay the debt, appellee could have the land. Appellee paid the debt off in five years.

Appellee and his witnesses testified that appellee had used the land continuously from 1913 to 1946, repairing the

house and barn, fixing the fences, digging a pond, cutting timber, cultivating a small portion of the land and cutting firewood from it. There was also testimony that appellee pastured the lands and ran cattle on it. The record indicates that after appellee left the property in 1946, he continued to keep the buildings in repair and placed a wire fence around the 120 acres.

Appellants produced two witnesses at trial, Martha Sims, sister of appellee who was 96 years old, and her son, Adam Sims. She testified that after her father died in 1913, appellee lived on the property and raised his family there. She said she knew appellee had sold timber off the land and that she never objected to appellee doing so. Her son, Adam Sims, testified that there had been discussions in years earlier among his uncles and aunts concerning a division of the property but nothing was done because they did not want to aggravate appellee. He further testified that one of these discussions among his aunts and uncles took place before 1946. He said he had known for fifty years that there would be a controversy about who owned the land and that the heirs let appellee continue to live there to avoid the "showdown". It was undisputed that appellee had paid the taxes on the disputed property during the 69 years of his possession.

The actions in the instant case are similar to those described in *Jones* v. *Morgan*, 196 Ark. 1153, 121 S.W.2d 96 (1938). In that case Morgan lived on, or leased out, property that had been owned by his parents until their death. "He sold the crops, paid taxes, disposed of timber, made im-provements, executed an oil lease, and in all respects treated the possession as one vesting exclusively in himself." This occurred during the period from 1900 to 1936, and his brothers and sisters permitted him to occupy and cultivate the place and to hold out to others that he was the owner. The Court there held that such actions were tantamount to a declaration of hostility to the claims of all persons, includ-ing people who claimed as co-tenants. The Court noted the following:

It is true there is no testimony that Morgan ever said to his sister or brothers, or to those claiming through

them, "I am claiming this land as my own; I deny your interest in it; take notice of my attitude." Nothing of this kind occurred; and yet, for more than thirty years, his conduct, his situation, and his actions in dealings affecting the property, were tantamount to a declaration of hostility to the claims of all persons — and "all persons" included those descending from the Morgans.

It is highly improbable appellants were ignorant of what others knew so well. *Edwards* v. *Swilley, ante* p. 633, 118 S.W.2d 584.

Another similar case is *Hildreth* v. *Hildreth,* 210 Ark. 342, 196 S.W.2d 353 (1946). In that case the Court found that the co-tenants:

For more than 20 years sat by, knew that S. D. Hildreth and appellee were making permanent and costly improvements; that they were living thereon, paying all the taxes and otherwise exercising all the acts of ownership. It was their duty to speak then, and, not having done so, equity will deny them the right to speak now.

As the chancellor in the case at bar noted, the other co-tenants " . . . had at one point long ago discussed trying to split up the land but decided not to attempt to oust appellee from the land because it would cause a 'showdown' if they tried . . . ". This is a patent recognition on the part of the co-tenants of the hostile character of appellee's possession. This took place, according to the testimony, prior to 1946 and, therefore, before L. A. Harvell ceased living on the property. Approximately thirty-six more years elapsed without any of the co-tenants making any claim of ownership to the property. To construe such inaction on the part of the co-tenants as anything less than sleeping on their rights would be, to quote from *Jones* v. *Morgan, supra,* " . . . out of harmony with every rule of reason and contrary to a preponderance of the testimony . . . ".

As this Court has often stated, the Chancellor will not be reversed unless his findings are clearly erroneous or

against the preponderance of the evidence, giving due regard to the opportunity of the trial court to judge the credibility of the witnesses. *DaCosse* v. *Ahrens,* 2 Ark. App. 61, 616 S.W.2d 777 (1981); ARCP Rule 52 (a). Since preponderance turns largely upon the credibility of the witnesses, the appellate courts defer to the superior position of the chancellor in that regard. *Mack Financial Corp.* v. *Carter Oil Co., Inc.,* 2 Ark. App. 48, 616 S.W.2d 769 (1981). From the evidence presented, the chancellor found that appellee had discharged his heavy burden of establishing ownership by adverse possession and we cannot say this was clearly erroneous.

Affirmed.

GLAZE, J., dissents.

TOM GLAZE, Judge, dissenting. I dissent. This adverse possession case involves a claim by one cotenant, Mr. L. A. Harvell, against other cotenants, comprised of appellee's only living sister (Martha Sims) and the descendants of appellee's deceased brothers and sisters. Because this suit involves cotenants, the *presumption* exists that possession by one tenant in common is possession by all tenants in common. *See Smith* v. *Kappler,* 220 Ark. 10, 245 S.W.2d 809 (1952). In *Smith,* the Supreme Court stated further:

> In order for the possession of a tenant in common to be adverse to that of his cotenants, knowledge of his adverse claim must be brought home to them *directly or by such notorious acts of unequivocal character that notice may be presumed.*

*Id.* at 13, 245 S.W.2d at 811 (emphasis supplied) (quoting *Hardin* v. *Tucker,* 176 Ark. 225, 3 S.W.2d 11 [1928]).

Although the majority court gave lip service to the foregoing rules, it (and the trial court) clearly erred in failing to apply those rules to the facts in this case. Instead, the court treated this case as though it were an adverse possession claim involving third party strangers and ignored the presumption that exists when cotenants are involved. I

believe a close study of the facts clearly supports my position.

Appellee's own testimony belies his asserted adverse claim. As noted by the majority, appellee's claim arose from an alleged agreement with his brothers, who are now deceased. Appellee stated that a $50 debt was owed against the subject property, and his brothers agreed that if appellee paid the indebtedness, he could have the land. Appellee testified that he paid the $50. *However, he admitted that none of his sisters was a party to any such agreement* because they were all living away from home. He said that he was "sure" his remaining sister, appellant Martha Sims, knew about his agreement with the brothers, but he had never discussed the agreement with her.

Ms. Sims denied any knowledge of either the alleged agreement or that appellee was claiming the family property. She was emphatic that she never agreed to give him the land for his paying a debt and, in fact, denied any knowledge that a debt ever existed. Ms. Sims testified that she had worked hard to pay for the land, and that she considered her interest the same as her brothers' and sisters'.

The other evidence upon which appellee relies to support his adverse possession is correctly recited in the majority opinion, and it is unnecessary to repeat that evidence here. Suffice it to say, however, that the evidence is not unlike the proof set out in *Palmer* v. *Sanders*, 240 Ark. 859, 402 S.W.2d 680 (1966), which was held insufficient to establish an adverse claim against cotenants. In *Palmer*, Justice George Rose Smith said:

> Mrs. Palmer occupied the land and paid the taxes during the years between her father's death in 1930 and the filing of this suit in 1962. It is firmly settled, however, that mere possession and payment of taxes are not evidence of adverse possession as between tenants in common. A cotenant who relies upon adverse possession must go a step farther by proving that he asserted a hostile claim and that notice thereof was brought home to his co-owners. *Smith* v. *Kappler*, 220

Ark. 10, 245 S.W.2d 809 (1952). There is no such proof in this case. Quite the opposite, the fact that Mrs. Palmer obtained conveyances from four of her brothers and sisters shows that she recognized their ownership.

*Id.* at 860, 402 S.W.2d at 681.

In the instant case, the evidence clearly establishes that appellee discussed his claim to the family property with his brothers but never with his sisters. In sum, he believed that he had acquired his brothers' interests in the property by agreeing to pay off a debt, but he knew that he had never acquired his sisters' interests. Appellee never directly, or by his actions, unequivocally apprised his sisters that he claimed their interest. Accordingly, the sisters were entitled to the benefit of the legal presumption that appellee's actual possession of their respective property was not hostile but instead, was consistent with his sisters' interests as tenants in common.

The majority (and trial judge) seems to rely on the testimony of Ms. Sims' son, Adam Sims, who testified that he knew there would be a showdown between appellee claim - ing to own the land on the one hand, and his brothers and sisters claiming their part on the other. Of course, whatever Mr. Sims' belief might be, it should not be imputed to his mother or her sisters — to do so would be speculative and conjectural. There is no evidence whatsoever that Mr. Sims, who is neither a cotenant nor an heir, expressed such an opinion to anyone else. Nor is there proof evidencing that any of the cotenants shared in the belief expressed by Mr. Sims.

In conclusion, I believe the appellee, as a cotenant, had a heavy burden to show *directly or,* by his acts, *un-equivocally* that he adversely claimed his brothers' and sisters' interests in their family property. If this case had not involved cotenants, his claim most likely was supported by the evidence. Because his claim was against cotenants, I am convinced his evidence fell far short.