Christine SHERMAN *v.* Earley WALLACE

CA 04-183                                    197 S.W.3d 10

Court of Appeals of Arkansas
Opinion delivered November 3, 2004

*James W. Harris*, for appellant.

*Danny W. Glover,* for appellee.

R OBERT J. GLADWIN, Judge. Appellant Christine Sherman appeals the Crittenden County Circuit Court's ruling that appellee Earley Wallace acquired title to two lots located in Earle, Arkansas, by adverse possession. We reverse and dismiss.

In 1960 Sam and Armetta Davidson acquired the lots in question by warranty deed. Upon Armetta's death, title to the property vested in Sam. Sam died in 1974 and left a will bequeathing one half of his interest in the property to Howard Wallace, Jr., his step-grandson, and one half to Christine Wallace Sherman, his step-granddaughter. On August 20, 1974, Christine and Howard filed an affidavit for the collection of small estates by distributees with the Crittenden County Probate Court, stating that the property of Sam Davidson was divided one half to Christine and one half to Howard.

In 1976 Howard and Earley Morton, who were unmarried at the time, took possession of the property. In 1981 Howard and Earley were married and continued to live on the property. Howard died in December 2002, and Earley filed a petition to quiet title to the land.

Christine neither paid any taxes nor requested rent from her brother. She stated that she asked her brother if he needed help paying taxes and that he declined. Christine testified that the reason she did not ask for rent and did not inspect the property was because her brother was living there. She also testified that she and Earley disliked one another and that she had once stated that she was going home to Detroit and was never coming back because of problems with Earley. When asked why she did not try to file a petition to get Earley off the property, Christine testified it was because of her brother; he wanted Earley there, so she did not want to do "anything like that." Christine testified that Earley sent a letter in 1994 requesting that she sign documents to remove her name from the property. Christine said she called her brother and told him, "I'm not going to take my name off the property. My step-father willed it to both of us, and I'm not removing my name." Christine also testified that "at no time did my brother ever give me any notice whatsoever that he was holding this property adverse to my interest."

Earley testified that she had lived on the property since 1976. She testified that she and Howard made numerous repairs and substantial improvements to the house but that Christine did not

contribute any money. Earley said that when she and Howard took possession of the property, there was no agreement between them and Christine as to who would own and possess the property. She said that Christine did not give them permission to live there and that they did nothing to conceal their possession of the property from Christine.

Earley also testified that in 1994 Howard went to legal services and had some papers prepared and sent them to Christine to get her name removed from the property. She stated that Christine called and talked to Howard and that Howard told her afterwards that Christine was angry and that if he was the "short liver," Christine was going to give Earley trouble about the property. Earley admitted that she and Howard both knew that Christine owned one half of the property, but they went ahead and fixed up the property. She said that Howard sent letters asking Christine to turn over her interest in the property. Earley admitted, however, that she did not know if Howard ever gave Christine any notice that he was holding the property adverse to her interest.

> The trial court held that ["regardless of whether [Howard], the co-tenant of Christine Sherman, exercised possession of the property hostile to Christine Sherman and regardless of whether [Howard] exercised possession of the property with the intent to hold against [Christine,] the court finds that Earley Wallace, who was not a co-tenant, exercised possession of the property hostile to [Christine] and with the intent to hold against [Christine] for over seven years. The court finds that the relationship between [Christine] and [Earley] was hostile and that [Earley] had sent notice in 1994 of her intent to claim ownership of the property."] The trial court concluded that Earley had established ownership of the property by adverse possession.

■ ■ The dispossession of the cotenant is a question of fact, and we will not reverse the trial court's decision absent a showing that it was clearly erroneous. *See Graham v. Inlow*, 302 Ark. 414, 790 S.W.2d 428 (1990). In *Utley v. Ruff*, 255 Ark. 824, 502 S.W.2d 629 (1973), the supreme court set forth the general principles of law concerning adverse possession:

> Title to land by adverse possession does not arise as a right to the one in possession; it arises as a result of statutory limitations on the rights of entry by the one out of possession. Possession alone does not

ripen into ownership, but the possession must be adverse to the true owner or record title holder before his title is in any way affected by the possession, and the word "adverse" carries considerable weight.

*Id.* at 826, 502 S.W.2d at 631.

In *Mitchell v. Hammons*, 31 Ark. App. 180, 792 S.W.2d 333 (1990), we discussed adverse possession as it relates to a claim against a cotenant:

In examining the issue of adverse possession we begin with the familiar rule that the possession of one tenant in common is the possession of all. A tenant in common is presumed to hold in recognition of the rights of his cotenants. It has been said that the presumption continues until an actual ouster is shown. Since possession by a cotenant is not ordinarily adverse to other cotenants, each having an equal right to possession, a cotenant must give actual notice to other cotenants that his possession is adverse to their interests or commit sufficient acts of hostility so that their knowledge of his adverse claim may be presumed. In order for the possession of one tenant in common to be adverse to that of his cotenants, knowledge of his adverse claim must be brought home to him directly or by such notorious acts of an unequivocal character that notice may be presumed. The statutory period of time for an adverse possession claim does not begin to run until such knowledge has been brought home to the other cotenants. There is no "hard and fast" rule by which the sufficiency of an adverse claim may be determined; courts generally look to the totality of the circumstances and consider such factors as the relationship of the parties, their reasonable access to the property, kinship, and enumerable [sic] other factors to determine if non-possessory cotenants have been given sufficient warning that the status of a cotenant in possession has shifted from mutuality to hostility. When a tenant in common seeks to oust or dispossess the other tenants and turn his occupancy into an adverse possession and thus acquire the entire estate by lapse of time under the statute of limitations, he must show when knowledge of such adverse claim or of his intention to so hold was brought home to them, for it is only from that time that his holding will be adverse. When . . . there is a family relation between cotenants, stronger evidence of adverse possession is required.

*Id.* at 184-185, 792 S.W.2d at 335 (citations omitted).

In *Ueltzen v. Roe*, 242 Ark. 17, 411 S.W.2d 894 (1967), the supreme court listed the following as factors to be considered

in determining whether possession is adverse: (1) possession of the property; (2) payment of taxes; (3) enjoyment of rents and profits; (4) making of improvements; (5) payments of insurance made payable to the possessor; (6) holding possession of lands for a long period of time, such as thirty years; (7) selling timber; (8) executing leases; (9) assessment of property in one's own name; (10) selling crops; (11) the execution, delivery, and recording of a deed by one cotenant that purports to convey the entire property; (12) generally treating property as one's own. However, the court noted that it was necessary to look at the evidence as a whole:

> What in one case would be sufficient as a warning might not be enough in another. Relationship of the parties, their reasonable access to the property and opportunity or necessity for dealing with it, their right to rely upon conduct and assurances of the tenant in possession, kinship, business transactions directly or incidentally touching the primary subject matter, silence when one should have spoken, natural inferences arising from indifference — these and other means of conveying or concealing intent may be important in a particular case, but not controlling in another; for after all what a designated plaintiff or defendant had in mind when he or she consummated an act or engaged in a course of conduct often depends upon the personal equation and the individual's method of expression. There can, therefore, be no "open and shut" rule by which purpose can be measured.

*Id.* at 21-22, 411 S.W.2d at 896, (citing *Linebarger v. Late*, 214 Ark. 278, 216 S.W.2d 56 (1948)).

Christine argues that the trial court erred in concluding that Earley adversely possessed the lots in question. She contends that because possession by one cotenant is not ordinarily adverse to another cotenant, there were not sufficient acts of hostility to put her on notice that Earley was holding the property adversely. Christine also argues that the court erred in concluding that the equities of the case were weighed in favor of Earley because of the improvements she made.

Earley relies on the case of *Martin v. Certain Lands in Izard County*, 9 Ark. App. 181, 656 S.W.2d 713 (1983), to support her position that she obtained the property by adverse possession. In *Martin*, L.A. Harvell had sole possession of a 120-acre tract of land for sixty-nine years. There was an agreement with his four brothers, who were cotenants, that if he paid off a debt on the land

he could have it. Harvell paid the debt and remained in sole possession of the property. Harvell's sister never objected to his living there and selling the timber. According to Harvell's nephew, nothing had been done concerning a division of the property for fifty years because there would be controversy and they wanted to avoid a "showdown." Further, Harvell paid the taxes on the property for sixty-nine years. In affirming the trial court's finding that Harvell had established ownership by adverse possession, this court held that there was recognition on the part of the cotenants of the hostile character of Harvell's possession.

■ The case at bar is clearly distinguishable from *Martin*. First, there was no clear recognition that Earley's possession was hostile. She first entered the land with Howard, and her possession was permissive. After she and Howard married and Howard died, her interest in the property was derived from Howard's interest, so she was a cotenant. Further, Christine indicated that she did not attempt to oust Earley because her brother wanted her there and Christine would not do "anything like that." Again, this shows permissive possession.

■ Earley's argument that the letter sent in 1994 is proof of her intention to hold the property adversely to Christine's interest is misplaced. Earley's testimony was that Howard sent the letter, not her. Further, there is no testimony whatsoever that the letter stated an unequivocal intent to hold the property adversely to Christine's interest. Both parties testified that the letter was a request for Christine to relinquish her interest in the property, which Christine declined. A request to relinquish one's interest in property does not in and of itself constitute a statement of intent to hold against the recipient's interest.

■ Earley also argues that her paying taxes and making improvements on the property were evidence of her hostile intent to hold the property. The trial court stated that these improvements caused the equities to be weighed in favor of Earley. In *Graham v. Inlow, supra*, the supreme court stated:

> It is well settled that a tenant in common has the right to make improvements on the land without the consent of his cotenants; and, although he has no lien on the land for the value of his improvements, he will be indemnified for them, in a proceeding in equity to partition the land between himself and cotenants either by

having the part upon which the improvements are located allotted to him or by having compensation for them, if thrown into the common mass.

302 Ark. at 417, 790 S.W.2d at 430 (citations omitted).

■■■ We agree with Christine and hold that the trial court's ruling was clearly erroneous. As a cotenant, Earley was required to prove that she gave actual notice to Christine that her possession of the property was adverse and hostile to Christine's interest, or to prove there were acts sufficiently hostile in nature that notice could be presumed. The request for Christine to relinquish her interest in the property, the payment of taxes, and the making of improvements to the land were not such notorious acts of an unequivocal character as to put Christine on notice that Earley was holding the property adversely to her interest.

For the reasons stated above, we hold that the circuit court's judgment was clearly erroneous. Accordingly, we reverse and dismiss.

Reversed and dismissed.

ROBBINS and VAUGHT, JJ., agree.