Cite as 2021 Ark. App. 153

# ARKANSAS COURT OF APPEALS

DIVISIONS III & IV
**No.** CV-19-786

|  |  |
|---|---|
| GARLAND TRICE JR. ET AL. | **Opinion Delivered** April 7, 2021 |
| APPELLANTS | APPEAL FROM THE LEE COUNTY CIRCUIT COURT [NO. 39PR-16-8] |
| V. | HONORABLE CHALK MITCHELL, JUDGE |
| EOIES TRICE AND OCIE TRICE | |
| APPELLEES | AFFIRMED |

**LARRY D. VAUGHT, Judge**

Garland Trice Jr. appeals the decree entered by the Circuit Court of Lee County quieting and confirming title in 173.5 acres of property (the property) in Lee County, Arkansas, in favor of Eoies Trice and Ocie Trice. On appeal, Garland Jr. contends that the circuit court clearly erred in finding that Eoies and Ocie adversely possessed the property. We affirm.

The property was originally owned by R.H. Slaughter, who died in 1943. He was survived by five children: Captola Miller, Ollie Ketchum, Henry Slaughter, Robert Slaughter, and Beatrice Dean. R.H. Slaughter had one daughter, Essie Trice, who predeceased him. Of his six children, only Beatrice, Robert, and Essie had children. Beatrice had a son who predeceased her. Robert has two sons who moved to Chicago in the 1950s and have not been heard from since. Essie has seven children: Trenton Trice, Dorothea

Trice, John Trice, Garland Trice Sr., Ethel Green, Mattie Mason, and Marguerite Dorsey. The parties to this litigation are the descendants of Essie Trice and the unknown heirs of Robert Slaughter. Attached as "Appendix A" is a chart of R.H. Slaughter's descendants.

When R.H. Slaughter died in 1943, he had a will, but it was not probated. The will left the property to his five surviving children; therefore, Essie Trice was left out of the will. The first litigation involving the property was in the late 1940s, when Trenton and Ollie filed an action against Henry, Beatrice, Dorothea, John, Garland Sr., Ethel, Mattie, Marguerite, and Charley Miller (the surviving spouse of Captola Miller).[1] In 1949, a decree was entered wherein the property was divided among R.H. Slaughter's surviving children (Henry, Robert, Beatrice, and Ollie) and Essie's children (Trenton, John, Garland Sr., Mattie, Dorothea, Ethel, Mattie, and Marguerite).[2]

The second lawsuit involving the property occurred in 1985, when Garland Sr., Dorothea, Ethel, Mattie, and Marguerite filed a partition action against Trenton, his son Ocie,[3] Lenora (John's widow), and the unknown heirs of Robert Slaughter.[4] The partition suit resulted in a consent decree that found Robert Slaughter's unknown heirs owned an undivided interest in one-half of the property, and Essie Trice's heirs owned an undivided

---

[1]Charley Miller has since passed away.

[2]The 1949 decree found that because none of Essie Trice's children were mentioned in R.H. Slaughter's will, her children were entitled to inherit various interests in the property as if R.H. Slaughter had died intestate.

[3]Trenton Trice has three children, Ocie, Eoies, and Irma Jean.

[4]Lenner Broadway was also a defendant in the 1985 partition case because he was a tenant on the property. He is not involved in, or relevant to, the current appeal.

interest in one-half of the property. The court further found that the property could not be equitably divided and that it would be in the best interest of all parties to sell the property at a public auction and distribute the proceeds to the respective owners. No sale occurred.

In 1997, Garland Sr., Ethel, Mattie, and Marguerite filed a third action concerning the property. This was a petition to partition the property filed against Trenton, his son Ocie, Lenora, and the unknown heirs of Robert Slaughter. During the pendency of the case, Trenton and Lenora passed away, leaving Ocie as the sole defendant.[5] At the onset of the 2003 trial, the circuit court granted Ocie's motion to amend the pleadings to include a counterclaim for adverse possession. After the trial, the court denied Garland Sr.'s partition action and found in favor of Ocie on the issue of adverse possession. Garland Sr. appealed, and this court affirmed the denial of the partition but reversed the adverse-possession finding concluding that Trenton and Ocies's unidentified cotenants did not have actual or presumed notice of Trenton and Ocie's adverse-possession claim. *Trice v. Trice*, 91 Ark. App. 309, 317, 210 S.W.3d 147, 153 (2005).

In 2016, three of Garland Sr.'s children[6]—Essie Trice-Hewett, Kalven Trice, and Ernest J. Trice—filed a petition for appointment of co-administrators of the estate of R.H. Slaughter and to partition the property. Eoies and Ocie answered and filed a counterclaim against the petitioners and a cross-claim against Garland Jr., the unknown heirs of Robert Slaughter, and others contending that Eoies and Ocie were adversely possessing the

---

[5]While not a party in the case, Eoies participated in the trial with Ocie.

[6]Garland Sr. passed away in 2008.

3

property. On February 26, 2018, the circuit court entered an order dismissing the petitioners' motion for the appointment of co-administrators.

A trial on the partition petition and the claims for adverse possession was held on November 14, 2018. Eoies testified that he left Lee County in 1949 but returned in 1975 and lives a quarter mile from the property. He stated that either he, his brother Ocie, or his father has maintained, worked, leased, and paid taxes on the property since the 1950s, although Eoies admitted he did not pay the taxes on the property in 2015. He said that Essie Hewett paid the 2015 taxes in 2016 before she filed this lawsuit. Eoies stated that his father had given his siblings deeds to the property in the 1980s, but they did not pay taxes, live, build, or improve on the property.[7] He said that later, Lenora and Mattie deeded him their interest in the property via quitclaim deed and a warranty deed, respectively, and that Dorothea deeded Ocie her interest in the property via quitclaim deed.[8] Eoies testified that he and Ocie collected rent from farmers and hunters who leased the land and did not share the proceeds with their cotenants.

Ocie testified that he had lived a quarter mile from the property since 2003 and that he and his brother have treated it as their own for the past twenty years. He testified that he has farmed fifty-seven acres of the property since 2006 and that none of his family has shared in his expenses. He said he has leased some of the property, and he has not shared any of

---

[7]The record contains copies of warranty deeds from 1982, 1984, 1988, and 1989 wherein Trenton granted all or some of the property to Dorothea, Lenora, Garland Sr., Ethel, Mattie, and Marguerite.

[8]These deeds were admitted into evidence at trial.

the rent proceeds with his family. He said that he and Eoies maintain and pay taxes on the property and keep others off the property.

Garland Jr. testified that since 2008, he goes to the property from time to time to take pictures and cut wood and that he was on the property a month before the trial. He said he has never been asked to leave the property. Garland Jr. also testified that he had paid taxes on the property, although he did not specify when and had no documentation to support his claim.

Ernest testified that he lives in Memphis but returns to the property two or three times a month. He said that he has never been asked to leave the property. He stated that he has asked Eoies and Ocie to share the property and the lease proceeds, but they refuse.

Kalven testified that he and his siblings have contributed money to pay the taxes on the property over the years, but he did not have any documentation to corroborate this. He stated that he had been on the property over the years but had not made any improvements to it.

Essie Hewett testified that she visits the property at least once or twice a month. She said that she has seen Eoies and Ocie while she is there, and they have never asked her to leave the property. In 2008, she asked Eoies and Ocie to share the lease proceeds, and they said no. She said that in 2016, around the time she filed this lawsuit, she paid the 2015 taxes on the property because she and her siblings realized Eoies and Ocie had decided not to share the property or the lease proceeds from the property.

The court took the matter under advisement, and on March 7, 2019, the court entered a decree, quieting and confirming title of the property in Eoies and Ocie, finding

5

that they adversely possessed it. The court found that Trenton had color of title, having received an interest in the property in 1949; that he had possessed the property from 1950 forward and exercised control over the property; and that he, Eoies, and Ocie had paid taxes on the property for more than seven years continuously. The court stated that the only tax paid by anyone else was the 2015 tax paid by Essie Hewett in 2016 before she filed this action. The court acknowledged the testimony from Garland Sr.'s four children that they had contributed to the payment of taxes over the years but found that there were no checks or tax receipts introduced to support that testimony.

Moreover, the court found that the unknown heirs of Robert Slaughter and the heirs of Garland Sr. were placed on notice that Eoies and Ocie claimed the property by adverse possession by virtue of the claims filed in the 1997 case. The court further found that the unknown heirs of Robert Slaughter and the heirs of Garland Sr. failed to take any action with regard to the property after this court's 2005 decision in *Trice* until Essie Hewett paid the 2015 taxes. Finally, the court found that Eoies and Ocie had leased the property to hunting clubs and farmers and kept the proceeds for themselves; they live within a quarter mile of the property and see it daily; and no other party had made a claim for the property except Essie in 2008 when she asked for proceeds from the lease, and she was told no. Garland Jr. appealed from the decree.[9]

In adverse-possession and quiet-title actions, we conduct a de novo review on the record. *Love v. O'Neal*, 2018 Ark. App. 543, at 5–6, 564 S.W.3d 546, 549. We will not

---

[9]We note that separate appellants Essie, Ernest, and Kalven also filed a notice of appeal from the decree. However, because they have failed to file a brief on appeal, they have abandoned any grounds or arguments for reversal.

reverse a finding of fact by the circuit court unless it is clearly erroneous. *Id.* at 6, 564 S.W.3d at 549. In reviewing a circuit court's findings of fact, this court gives due deference to that court's superior position to determine the credibility of the witnesses and the weight to be accorded their testimony. *Id.*, 564 S.W.3d at 549. We do not, however, defer to the circuit court on a question of law. *Id.*, 564 S.W.3d at 549.

This appeal is governed by statute and case law. Arkansas Code Annotated section 18-11-106(a)(1)(A) (Repl. 2015) provides:

> To establish adverse possession of real property, the person and those under whom the person claims must have actual or constructive possession of the real property being claimed and have either:
>
> (1)(A) Held color of title to the real property for a period of at least seven (7) years and during that time paid ad valorem taxes on the real property.

To prove the common-law elements of adverse possession, a claimant must show that he has been in possession of the property continuously for more than seven years and that his possession has been visible, notorious, distinct, exclusive, hostile, and with the intent to hold against the true owner. *Trice*, 91 Ark. App. at 316, 210 S.W.3d at 152. It is ordinarily sufficient proof of adverse possession that the claimant's acts of ownership are of such a nature as one would exercise over his own property and would not exercise over the land of another. *Id.*, 210 S.W.3d at 152.

Additional factors come into play when one cotenant asserts adverse possession against the others because the possession of one tenant-in-common is the possession of all. *Id.*, 210 S.W.3d at 152. Because possession by a cotenant is not ordinarily adverse to other cotenants, each having an equal right to possession, a cotenant must give actual notice to other cotenants that his possession is adverse to their interests or commit sufficient acts of

7

hostility so that their knowledge of his adverse claim may be presumed. *Id.*, 210 S.W.3d at 152. The statutory period of time for an adverse-possession claim does not begin to run until such knowledge has been brought home to the other cotenants. *Id.*, 210 S.W.3d at 152. There is no hard-and-fast rule by which the sufficiency of an adverse-possession claim may be determined; however, we consider factors such as the relationship of the parties, their reasonable access to the property, kinship, and innumerable other factors to determine if nonpossessory cotenants have been given sufficient warning that the status of a cotenant in possession has shifted from mutuality to hostility. *Id.* at 316–17, 210 S.W.3d at 152. When there is a familial relation between cotenants, stronger evidence of adverse possession is required. *Id.* at 317, 210 S.W.3d at 152.

Garland Jr. first argues that Eoies and Ocie did not have color of title because Trenton did not have color of title—he had deeded his interest in the property to his siblings. In *Bailey v. Jarvis*, 212 Ark. 675, 680, 208 S.W.2d 13, 15 (1948), the supreme court defined the meaning of "color of title" by adopting the following language from a West Virginia decision:

> Color of title is not, in law, title at all. It is a void paper, having the semblance of a muniment of title, to which, for certain purposes, the law attributes certain qualities of title. Its chief office or purpose is to define the limits of the claim under it. Nevertheless, it must purport to pass title. In form, it must be a deed, a will, or some other paper or instrument by which title usually and ordinarily passes.

(citing *State v. King*, 87 S.E. 170, 171 (W.V. 1915)).

In the case at bar, the evidence demonstrates that Trenton had color of title to the property. The 1949 decree awarded him an undivided one thirty-fifth interest in the property, and Trenton's interest in the property would have been passed down to Eoies and

8

Ocie. To the extent that Trenton gave some or even all of his interest in the property to his siblings in the 1980s via warranty deeds, the record also demonstrates that three of these siblings later granted their interest in the property to Eoies and Ocie. Therefore, we hold that the circuit court did not clearly err in finding that Eoies and Ocie have color of title to the property.

Second, Garland Jr. argues that Eoies and Ocie failed to pay ad valorem taxes on the property required by Arkansas Code Annotated section 18-11-106(a)(1)(A) (Repl. 2015). We disagree. The record reflects that Trenton and Eoies had paid all the taxes on the property from the 1950s to 2014. The circuit court acknowledged testimony from Garland Sr.'s children that they had contributed to the payment of taxes on the property over the years; however, the court discounted this testimony on the basis of a lack of proof introduced to support the testimony. Credibility determinations are left to the circuit court, and we will not reweigh the evidence. *Williams v. Williams*, 2019 Ark. App. 186, at 19, 575 S.W.3d 156, 166.

Garland Jr. also argues under this point that because it is undisputed that Essie Hewett paid the 2015 taxes on the property, Eoies and Ocie failed to pay taxes for seven consecutive years immediately prior to this action. Garland Jr. is mistaken. Section 18-11-106(a)(1)(A) does not require that the seven-year period be immediately prior to the quiet-title action. Section 18-11-106(a)(1)(A) states that a claimant must hold "color of title to the real property for a period of at least seven (7) years and during that time paid ad valorem taxes on the real property." Here, evidence was presented that Eoies had paid ad valorem taxes

9

on the property during the relevant period of 2005 to 2014, which exceeds the required seven-year period.

Next, Garland Jr. claims that the circuit court clearly erred in finding that Eoies and Ocie placed all the cotenants on notice of their adverse-possession claim for the required statutory time period. In his brief, the entirety of his argument is that "it is undisputed that notice wasn't made on all cotenants (either by mail or warning order) until September 2018 . . . . As such, the statutory time period for adverse possession has not yet expired." Garland Jr. fails to cite any authority to support this one-paragraph argument, and we reject it.

Our case law provides that a cotenant must give notice to other cotenants that his possession is adverse to their interests in one of two ways: either give actual notice or commit sufficient acts of hostility so that the cotenant's knowledge of the adverse claim may be presumed. *Trice*, 91 Ark. App. at 316, 210 S.W.3d at 152. It is undisputed that Garland Sr.'s heirs had actual knowledge of Eoies and Ocie's adverse-possession claim. In *Derryberry v. Sims*, 267 Ark. 846, 846, 591 S.W.2d 662, 663 (1979), the following issue was presented: "Does the filing of a complaint to quiet title on the basis of adverse possession satisfy the requirement of actual notice of plaintiff's claim of exclusive ownership to persons claiming to be cotenants?" The supreme court held: "[W]e can think of no more unequivocal way of conveying notice than by filing a suit to quiet title." *Id*. at 848, 591 S.W.2d at 663. Accordingly, Garland Sr., who was a party to the 1997 lawsuit along with his successors in interest, had actual notice of Eoies and Ocie's adverse-possession claim in 2005 at the latest.[10]

---

[10]Three of Garland Sr.'s heirs conceded this point at trial. Garland Jr. testified he was very familiar with the 1997 lawsuit his father filed against Trenton, and his siblings Ernest

Further, as it relates to the unknown heirs of Robert Slaughter, contrary to Garland Jr.'s argument, our case law does not provide that service by warning order is required to presume actual knowledge of an adverse-possession claim. Actual knowledge can be presumed by other means, and the circuit court in this case identified a different means of presuming actual knowledge. The circuit court found that Eoies and Ocie's filing of the adverse-possession claim in the 1997 case was an act of hostility sufficient to presume that the unknown heirs of Robert Slaughter had actual knowledge of the adverse claim. We discern no practical difference between presuming actual knowledge from the constructive notice afforded by warning-order service to an out-of-state cotenant and presuming actual knowledge from the publication of a 2005 opinion of this court. Accordingly, we hold that the circuit court did not clearly err in finding that Eoies and Ocie gave the required notice of their adverse-possession claim to the property.[11]

Finally, Garland Jr. argues that the circuit court clearly erred in finding that Eoies and Ocie have been in sole possession and control of the property. The circuit court found

_____

and Essie Hewett both testified they were aware of the adverse-possession claim in 2005 when this court handed down its decision from the 1997 lawsuit.

[11]On the issue of notice, the dissents correctly point out that the circuit court made an incorrect finding of fact when it stated in its decree that "Petitioners and Third-party Defendants are the heirs of Garland Trice, Ethel Trice, Mattie Mason and [Marguerite] Dorsey." This finding is erroneous because it concludes that the unknown heirs of Robert Slaughter are the descendants of Essie Trice (the ancestor of Garland Trice Sr., Ethel Trice, Mattie Mason, and Marguerite Dorsey). However, this error is incidental and does not mandate reversal because it has no effect on the circuit court's dispositive finding that Eoies and Ocie provided the required notice of their claim of adverse possession to *all* the cotenants. As explained above, both the heirs of Essie Trice and the unknown heirs of Robert Slaughter were given actual notice or were presumed to have been given actual notice of Eoies and Ocie's claim of adverse possession.

11

that since 2005, Eoies and Ocie have been exercising sole control over the property by maintaining, farming, improving, leasing, and protecting it. There was substantial testimony from Eoies and Ocie to support this finding. In addition, a 2016 farming lease was introduced into evidence. Further, there was evidence that in 2008, Essie Hewett asked Eoies and Ocie to share the lease proceeds, and they told her no. There was evidence that Ernest asked Eoies and Ocie two and three times a year until about two years ago to share the property, and they told Ernest no—Ocie told Ernest to "get a lawyer." And finally, Ocie filed a claim for adverse possession of the property in the 1997 litigation—a significant act of hostility against the cotenants.

Garland Jr. and his siblings did testify that they were on the property monthly, they cut wood on the property, took pictures while on the property, and were never asked to leave the property. Again, the circuit court did not have to believe this testimony. Garland Jr. is asking this court to reweigh the credibility findings made by the circuit court, which we will not do. *Williams*, 2019 Ark. App. 186, at 19, 575 S.W.3d at 166. Therefore, we hold that the circuit court did not clearly err in finding that Eoies and Ocie were in sole possession and control of the property.

For the reasons stated, we hold that the circuit court's adverse-possession finding is not clearly erroneous, and we affirm.

Affirmed.

HARRISON, C.J., and GLADWIN and MURPHY, JJ., agree.

WHITEAKER and HIXSON, JJ., dissent.

12

# APPENDIX A– R.H. SLAUGHTER HEIRS



**PHILLIP T. WHITEAKER, Judge, dissenting**. I join the dissenting opinion of Judge Hixson. I write separately to set forth the three reasons why I respectfully disagree with the majority opinion.

First, the circuit court made an incorrect finding of fact. It incorrectly determined that the unknown heirs of Robert Slaughter are heirs of Essie Trice. As Judge Hixson points out in his opinion, this finding is clearly erroneous and should mandate our reversal.

Second, the circuit court erred in determining that *all heirs* of Essie Trice received notice of hostility. Specifically, the circuit court found that Eoies and Ocie's filing of the adverse-possession claim in the 1997 case was an act of hostility sufficient to presume that the unknown heirs of Robert Slaughter had actual knowledge of the adverse claim. The majority opinion affirms stating, "We discern no practical difference between presuming actual knowledge from the constructive notice afforded by warning-order service to an out-of-state cotenant and presuming actual knowledge from the publication of a 2005 opinion of this court."

I do see a practical difference. The presumption of actual knowledge from the constructive notice provided by warning order is statutory. The presumption of actual knowledge from the publication of an appellate decision is not. Here, the unknown heirs of Robert have owned an undivided interest in one-half of the property since the 1985 consent decree; and while they have been named parties in the dispute for years, there is no evidence in our record that they were ever served with a warning order in either the 1985 or 1997 litigation or that they have ever appeared in any of the four litigations over this property. Thus, on our record, there is simply no evidence that the unknown heirs of

Robert had any actual or constructive knowledge of the prior litigation. Despite this, the majority opinion concludes that the unknown heirs of Robert were placed on notice by a 2005 published opinion from this court that stems from that prior litigation. I cannot agree. I do not believe that this satisfies due process. Rather, it appears to create a reverse definition of insanity: keep doing the same thing over and over and eventually you will get a different result.

Third, we previously reversed a finding of adverse possession on essentially the same facts in our earlier *Trice* opinion. I see no significant factual distinction between the facts presented in this current round of litigation from that previously presented in *Trice*. To reverse and to affirm on essentially the same set of facts between the same parties is to render inconsistent opinions.

**KENNETH S. HIXSON, Judge, dissenting**. A legal opinion, much like a structure, can only remain standing if it is constructed on a strong foundation. If the foundation fails, the opinion fails. Here, the majority opinion is constructed on a faulty, unsupported, and incorrect finding of fact by the circuit court. Hence, much like a structure collapsing with a faulty foundation, the majority opinion collapses as well. For the first time, this court has approved stripping a cotenant of ownership of property without notice, either actual or presumed, as required by law. Therefore, I would reverse.

While several of the facts in the case are in dispute, one fact is not. In 1985, the circuit court entered a consent order and concluded that the property[12] in dispute was

---

[12]Actually, the property was divided into five tracts. The court concluded the following: Tract 1 ownership is Robert Slaughter's Unknown Heirs 50% and Essie Slaughter Trice's Heirs 50%; Tract 2 ownership is Robert Slaughter's Unknown Heirs 75% and Essie

15

owned in two shares by a son and a daughter of R.H. Slaughter. The court generally concluded that the unknown heirs of son, Robert Slaughter,[13] own a one-half interest, and the heirs of daughter, Essie Slaughter Trice (Essie Trice), own a one-half interest. That fact has not changed since 1985, and it has remained a fact up to the date of the trial in the circuit court below. Every single person in this case litigating the ownership of this property is an heir of Essie Trice. None of the persons litigating are the unknown heirs of Robert Slaughter.[14] Without the unknown heirs of Robert Slaughter receiving the proper notice of hostility for at least seven years before any claim for adverse possession, the only ownership the heirs of Essie Trice could possibly be fighting over is her one-half interest in the disputed property.

The faulty, unsupported, and incorrect (and fatal) finding of fact by the circuit court is this. In determining whether all parties had the requisite notice of hostility or notice of

_____

Slaughter Trice's Heirs 25%; Tract 3 ownership is Robert Slaughter's Unknown Heirs 50% and Essie Slaughter Trice's Heirs 50%; Tract 4 ownership is Essie Slaughter Trice's Heirs 100%; and Tract 5 ownership is Robert Slaughter's Unknown Heirs 50% and Essie Slaughter Trice's Heirs 50%. However, for purposes of this dissent, this division is irrelevant, and the interests are generally referred to herein as a one-half interest for each sibling.

[13]In the 1950s, two sons of Robert Slaughter moved to Chicago. They have not been heard from since. These two sons and their heirs, if any, are the "unknown heirs of Robert Slaughter." They have never participated in any of the litigations set forth in the majority opinion.

[14]The unknown heirs of Robert Slaughter were later brought into the litigation as third-party defendants when a notice of quiet-title action was published in the *Courier-Index* newspaper naming multiple heirs of Essie Trice and included "any survivors of Robert H. Slaughter, deceased." The publication noticed any persons or entities claiming any title or interest in the real property to appear at the November 14, 2018, trial to assert any interest and demonstrate "why title to this property should not be quieted and confirmed in Counter-Claimants/Third-Party Plaintiffs Eoies Trice and Ocie Trice."

16

adverse possession, the circuit court incorrectly determined that the unknown heirs of Robert Slaughter were actually heirs of his sister, Essie Trice. Specifically, the court found the following: "At that time, the Third-Party Defendants and Petitioners, as descendants of Garland Trice, Ethel Trice, Mattie Mason and Margaret Dorsey who now claim interest through their ancestors, were all placed on notice that Trenton Trice and his heirs claimed this property by adverse possession." Without a doubt, this finding is clearly erroneous and should mandate our reversal.

However, that is not the only error requiring reversal. The majority opinion affirms the finding of the circuit court that *all heirs* of Essie Trice received notice of hostility. That is also in error. With this short introduction, I will more fully explain my disagreement with the majority.

While the majority opinion correctly outlines the voluminous heirs of R.H. Slaughter, a succinct summary of the players may be helpful. R.H. Slaughter had six children. However, only two of his children left descendants. His son, Robert Slaughter, had two sons; and his daughter, Essie Trice, had seven children.

The two sons and heirs of Robert Slaughter moved to Chicago in the 1950s and have not been heard from since. A list of the heirs of Essie Trice was attached to a probate pleading. This list contained the identity of forty-seven heirs and their addresses. The heirs were scattered throughout Arkansas, Illinois, Michigan, Missouri, and other parts of the United States. These heirs included, but were not limited to, appellees Eoies Trice and Ocie Trice, and appellant Garland Trice, Jr. These forty-seven persons, as heirs of Essie Trice, were cotenants of this property along with the heirs of Robert Slaughter.

17

As we have previously explained in other cases, a mere lapse of time will not dissolve a co-tenancy. *Wood v. Wood*, 51 Ark. App. 47, 908 S.W.2d 96 (1995). Additional factors come into play when one cotenant asserts adverse possession against the others because the possession of one tenant in common is the possession of all. *Trice v. Trice*, 91 Ark. App. 309, 210 S.W.3d 147 (2005). Because possession by a cotenant is not ordinarily adverse to other cotenants, each having an equal right to possession, a cotenant must give actual notice to other cotenants that his possession is adverse to their interests or commit sufficient acts of hostility so that their knowledge of his adverse claim may be presumed. *Id*. The statutory period of time for an adverse-possession claim does not begin to run until such knowledge has been brought home to the other cotenants. *Id*. There is no hard-and-fast rule by which the sufficiency of an adverse claim may be determined; however, we consider factors such as the relationship of the parties, their reasonable access to the property, kinship, and innumerable other factors to determine if nonpossessory cotenants have been given sufficient warning that the status of a cotenant in possession has shifted from mutuality to hostility. *Id*. When there is a family relation between cotenants, stronger evidence of adverse possession is required. *Id*. The dispossession of the cotenant is a question of fact, and we will not reverse the circuit court's decision absent a showing that it was clearly erroneous. *Sherman v. Wallace*, 88 Ark. App. 229, 197 S.W.3d 10 (2004).

As stated above, Essie Trice had seven children. This case commenced as infighting among the heirs of Essie Trice. One set of her heirs claimed the property should be partitioned, sold, and the proceeds distributed among all her heirs, and another set of her heirs claimed ownership by adverse possession. Garland Trice, Jr., an heir of Essie Trice

18

(from the partitioning camp), argues on appeal that the seven-year statutory time period for adverse possession has not yet expired because the statutory period of time for an adverse-possession claim does not begin to run until such knowledge of hostility has been brought home to *all* other cotenants. He alleges that the evidence Eoies Trice and Ocie Trice—as heirs of Essie Trice (from the adverse-possession camp)—presented at trial in the current litigation did not show they had provided notice by mail, warning order, or otherwise to *all* cotenants until September 2018 when they issued the warning order.[15] Because a cotenant must give actual notice to other cotenants that his possession is adverse to their interests or commit sufficient acts of hostility so that their knowledge of his adverse claim may be presumed, the statutory period of time for an adverse-possession claim does not begin to run until such knowledge is brought home to the other cotenants. *Trice, supra.* Therefore, with this standard, we must answer the following two questions: (1) whether the adverse possessors gave actual notice to other relative cotenants that their possession was adverse to their interests or committed sufficient acts of hostility so that their knowledge of their adverse claim may be presumed; and (2) when was this notice of intent to claim adverse possession given to the relative cotenants so as to commence the seven-year adverse-possession period. In other words, in order for Eoies Trice and Ocie Trice to prevail in the current claim for adverse possession, they were required to show that they gave sufficient warning to *all* the nonpossessory relative cotenants that their possession had shifted from mutuality to hostility and that their notice was given at least seven years prior to the filing of this litigation in 2016.

---

[15] *See* footnote 3.

In answering these questions, it is helpful to recall the previous 1997 litigation culminating in our 2005 *Trice* opinion. There, we reversed and dismissed the adverse-possession counterclaim and provided the following analysis:

> There was testimony that *Trenton claimed ownership of all of the land, farmed the property, made improvements on it, leased it, paid taxes on it, and exercised exclusive control over it since the 1950s. However, because a tenant in common is presumed to hold the property in recognition of the rights of his co-tenants, all of these acts were consistent with the types of action a co-tenant—especially a family member—can take without giving notice of an adverse claim to his co-tenants.* We acknowledge that testimony was presented indicating that Trenton issued several deeds to the property. However, no deeds were introduced reflecting these conveyances. Based on this lack of proof, the trial court refused to find "that the conveyances actually occurred." Despite this finding, the trial court went on to conclude that the fact that Trenton made these conveyances was an important sign of his sole ownership of the property. In our analysis, we resolve this contradiction by giving no weight to the alleged conveyances based on the trial court's refusal to recognize that Trenton actually conveyed the property.

> Therefore, we are left with the testimony that Garland was forced to leave the property on a couple of occasions as the only persuasive proof of an adverse action against a co-tenant. *However, Garland was only one of the potentially large number of co-tenants, and, in the absence of evidence showing acts of hostility toward the other co-tenants, Garland's removal from the property cannot be characterized as anything other than an adverse act against a singular co-tenant. Further, as discussed previously, the various interests in the property have not been sufficiently identified. Thus, it would be very difficult, if not impossible, to prove actual notice to or hostile acts against unidentified co-tenants.* We are convinced that the evidence of Trenton's adverse possession claim falls short of the heavy burden that a family-member co-tenant must satisfy to establish adverse possession against his co-tenants. Therefore, we hold that the trial court's finding of adverse possession is clearly erroneous, and we reverse and dismiss on this issue.

*Trice*, 91 Ark. App. at 317, 210 S.W.3d at 152–53 (emphasis added). That begs the question: Why does this current Trice case render a different and inconsistent result vis-à-vis the 2005 *Trice* case? The 2005 *Trice* opinion reversed the finding of adverse possession citing a lack of notice to all cotenants; however, the majority in this case affirms a finding of adverse possession concluding all cotenants were notified. Why the opposite result? So, one should inquire, what new evidence did Eoies Trice and Ocie Trice present at this trial to show that

20

they gave actual notice to the other relative cotenants that their possession was adverse to the other relative cotenants' interests or that they committed sufficient acts of hostility so that the other relative cotenants' knowledge of their adverse claim may be presumed?  Using our language in the 2005 *Trice* opinion: Did Eoies Trice and Ocie Trice satisfy the "very difficult, if not impossible, [burden] to prove actual notice to or hostile acts against unidentified co-tenants?"  *Trice*, 91 Ark. App. at 317, 210 S.W.3d at 153.

The evidence presented at the present trial was very similar to the evidence presented in the 1997 litigation.  Eoies Trice and Ocie Trice testified that they paid taxes, rented the property, and collected rent for themselves just as their father, Trenton Trice, had done in the 1997 litigation before he died.  That was not deemed enough then; nor should it now.  Although the fact Trenton Trice issued a couple of deeds to the portions of the property to his siblings was discussed in the 2005 opinion, we did not consider that evidence then because the deeds had not been introduced into evidence at the previous trial.  The deeds were introduced into evidence at the trial here.  Those deeds, however, should not alter our decision.  We held in *Trice* that evidence of hostility against one or two cotenants is not sufficient to prove hostility against *all* cotenants.  Furthermore, we have previously held that a *cotenant* is not expected to check the records constantly to determine whether instruments affecting title have been executed.  *See Mitchell v. Hammons*, 31 Ark. App. 180, 792 S.W.2d 333 (1990).  In *Mitchell*, we held that evidence of a deed "containing the false recital of heirship from [two cotenants] to themselves" and one cotenant leasing the property in question were not actions so notorious that notice may be presumed.  *Mitchell*, 31 Ark. App.

at 185, 792 S.W.2d at 336. Again, the evidence presented here is just as insufficient as it was in the 1997 litigation.

Eoies Trice and Ocie Trice did not provide evidence that they restricted the heirs from having access to the property if they visited nor were they making permanent and valuable improvements as was the case in *Ueltzen v. Roe*, 242 Ark. 17, 411 S.W.2d 894 (1967). In fact, they testified that no one resided on the property for approximately forty-one years since 1975, and there were no buildings on the property. Instead, their actions were similar to the insufficient actions in *Hopper*. There, we held that the payment of taxes, sale of timber, appearance before a board of equalization to attempt a reduction in property taxes, or a lease of the land or minerals did not bring home to an out-of-state cotenant knowledge of hostile acts. *Hopper v. Daniel*, 72 Ark. App. 344, 38 S.W.3d 370 (2001). And, as we stated in in the 2005 *Trice* opinion, "*[A]ll of these acts were consistent with the types of action a co-tenant—especially a family member—can take without giving notice of an adverse claim to his co-tenants.*" *Trice*, 91 Ark. App. at 317, 210 S.W.3d at 152 (emphasis added).

So, on what did the circuit court base its decision regarding notice to *all cotenants*? The circuit court stated the following:

> The Petitioners and Third-Party Defendants were given notice of Respondents' adverse possession claim to the 173.5 acres. *The said Petitioners and Third-party Defendants are the heirs of Garland Trice, Ethel Trice, Mattie Mason and Margaret Dorsey.* These persons were represented by counsel in the second partition action filed by Garland Trice and others in 1997. This case was decided by Judge Bell in 2003 resulting in an appeal decided in 2005. Trenton Trice and his sons Ocie Trice and Eoies Trice claimed the land by adverse possession which issue was tried by Judge Bell. *At that time the Third-Party Defendants and Petitioners, as descendants of Garland Trice, Ethel Green, Mattie Mason and Margaret Dorsey who now claim interest through their*

22

> *ancestors, were all placed on notice that Trenton Trice and his heirs claimed this property by adverse possession.*

(Emphasis added.) Clearly, the circuit court was confused, and its findings were clearly erroneous for multiple reasons.

As already stated, *both* Robert Slaughter's unknown heirs and Essie Trice's heirs held an interest in this property as tenants in common according to the 1985 consent decree. Further, Robert Slaughter's unknown heirs were added as third-party defendants in the current 2016 litigation and provided notice of these proceedings only by warning order published in the local newspaper in 2018. However, contrary to the circuit court's findings, Robert Slaughter's unknown heirs *are not* "the heirs of Garland Trice, Ethel Trice, Mattie Mason and Margaret Dorsey." Therefore, absent a warning order in either the 1985 or the 1997 litigation (which neither Eoies Trice nor Ocie Trice admitted into evidence even though it was their burden to do so), Robert Slaughter's unknown heirs could not have been given notice and certainly not *as heirs* of Garland Trice, Ethel Trice, Mattie Mason, and Margaret Dorsey as found by the circuit court. In effect, the circuit court's decree divested Robert Slaughter's unknown heirs of their one-half interest without any evidence of notice before the 2018 warning order provided in the current litigation. Obviously, seven years had not elapsed from the 2018 warning order, which would have commenced the seven-year period, when the circuit court filed its decree on March 1, 2018. Remember, the crux of our 2005 *Trice* opinion wherein we reversed the finding of adverse possession was that the relative cotenants were required to prove actual notice to or sufficient hostile acts against *all* the cotenants—not just an isolated few of them. The adverse possessors failed in 1997; and likewise, they failed herein.

The majority concludes that notice was nevertheless provided to Robert Slaughter's unknown heirs because our 2005 *Trice* opinion was a matter of public record. In fact, the majority states, "We discern no practical difference between presuming actual knowledge from the constructive notice afforded by warning-order service to an out-of-state cotenant and presuming actual knowledge from the publication of a 2005 opinion of this court." I disagree. The purpose of a warning order is to satisfy due process and provide notice to landowners that their property rights are being attacked. There are very specific rules regarding the issuance and reliability of warning orders including, but not limited to, that notice must be published for four consecutive weeks in a local newspaper. *See* Ark. R. Civ. P. 4; Ark. Code Ann. § 18-60-503 (Repl. 2015). However, with that in mind, the majority nevertheless concludes there is no practical difference between the strict adherence in the issuance of warning orders to satisfy due process and a legal opinion issued by an appellate court which is, at best, published on the Arkansas Judiciary website. That conclusion strains credulity.

Moreover, I cannot say that simply because our 2005 *Trice* opinion is a matter of public record, it places multigenerational heirs on notice for the same reason we have also said that a cotenant is not expected to check the records constantly to determine whether instruments affecting title have been executed. *See Mitchell*, 31 Ark. App. 180, 792 S.W.2d 333. One cannot reasonably presume that Robert Slaughter's heirs, who were last known to reside in Chicago, would have known, or would have been presumed to know, about Eoies Trice and Ocie Trice's hostile intent simply because our 2005 opinion would have been published on our website and is a matter of public record. The majority does not cite

24

any authority, nor have I found any, that requires a cotenant to read every published court opinion in order to ascertain whether someone else might be claiming entitlement to his or her property. This cumbersome burden was precisely the type of burden that was rejected in *Mitchell*, *supra*. Therefore, because Robert Slaughter's unknown heirs were not provided any reasonable form of notice of adversity until the 2018 warning order, I would conclude that the circuit court's findings were clearly erroneous on this basis alone.

Regarding the requisite notice to *all* the heirs of Essie Trice, the majority cites *Derryberry v. Sims*, 267 Ark. 846, 591 S.W.2d 662 (Ark. Ct. App. 1979), for the proposition that the mere filing of a lawsuit for adverse possession constitutes notice to all cotenants. However, *Derryberry* is easily distinguished. In *Derryberry*, the contest was between four sisters. One sister filed a lawsuit for adverse possession in 1955 against her other three sisters. The opposing sisters filed a motion to require the one sister to make her complaint more definite and certain. Unbelievably, however, the opposing three sisters did not file an answer or seek any affirmative relief until twenty-one years later. In 1976, the opposing sisters filed an answer denying that they were given notice of adverse possession to commence the seven-year period. The circuit court found that by filing a complaint twenty-one years earlier, *in the same lawsuit*, the opposing sisters had notice of hostility and that seven years had passed since the complaint had been filed. Moreover, the circuit court found that the filing, in 1955, of the motion to make more definite and certain confirmed that the opposing sisters knew of the suit.

*Derryberry* does not remotely describe the facts in the case at bar. First, the complaint in *Derryberry* that gave rise to notice *was in the same lawsuit*—not a lawsuit filed in 1985 as

25

we have here. Secondly, the parties in *Derryberry* are of the same ancestral generation—all sisters. *Derryberry* was not a multigenerational lawsuit like we have here where, according to the majority, notice to a parent or grandparent is sufficient for notice to a child or grandchild. I am obviously troubled by the majority's conclusion in this regard. Thirdly, in *Derryberry*, there was evidence that the interested parties had knowledge of the suit because they filed a motion in 1955. However, in the current litigation, Eoies Trice and Ocie Trice failed to introduce any evidence at trial that *all* Essie Trice's heirs and Robert Slaughter's unknown heirs had any knowledge of the 1997 litigation. In short, *Derryberry* has no application to the case at bar.

In conclusion, I would reverse and dismiss this case for two separate but related reasons. One, the unknown heirs of Robert Slaughter—one-half co-owners and relative cotenants—were never provided the requisite notice of hostility, and the seven-year period of adverse possession did not commence until the warning order of September 2018. And two, *all* the heirs of Essie Trice were not provided the requisite notice of hostility, and the seven-year period of adverse possession did not commence against *all* the heirs of Essie Trice until the warning order of September 2018. Because I would conclude that the circuit court's decree quieting and confirming title in Eoies Trice and Ocie Trice by adverse possession was clearly erroneous, I would reverse and dismiss.

WHITEAKER, J., joins.

*Leigh Law, PLLC*, by: *Danielle Hasty*; and *Walas Law Firm, PLLC*, by: *Breean Walas*, for appellant.

*John D. Bridgforth, P.A.*, by: *John D. Bridgforth*, for appellees.